STATE OF LOUISIANA

VERSUS

TEDDY CHESTER

NO. 19-KA-363

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 96-2598, DIVISION "K"
HONORABLE ELLEN SHIRER KOVACH, JUDGE PRESIDING

February 03, 2021

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Stephen J. Windhorst, and Hans J. Liljeberg

<u>**AFFIRMED**</u>
**MEJ**
**SJW**
**HJL**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Darren A. Allemand

COUNSEL FOR DEFENDANT/APPELLANT,
TEDDY CHESTER
      Shanita Farris
      Rachel I. Conner

AMICUS CURIAE,
THE CENTER FOR INTEGRITY IN FORENSIC SCIENCES AND THE
INNOCENCE NETWORK
      Bidish J. Sarma

**JOHNSON, J.**

Appellant, Teddy Chester, was convicted of first degree murder in violation of La. R.S. 14:30 on May 14, 1997, after a two-day trial, and the jury recommended a sentence of death shortly thereafter. Defendant applied for federal relief after exhausting all avenues for relief in the state court system. The United States District Court for the Eastern District of Louisiana granted Defendant's writ of habeas corpus and ordered the State to either release or retry Defendant. After a second trial in 2018, Defendant was convicted of second degree murder and sentenced to life imprisonment. On appeal, Defendant has identified several assignments of error, which Defendant urges cumulatively, if not individually, require reversal of his conviction and sentence. For the following reasons, we affirm Defendant's conviction and sentence.

*FACTS AND PROCEDURAL HISTORY*

In the early morning hours of December 27, 1995, Mr. John Adams was shot and killed inside the cab he operated on Calhoun Street in Kenner, Louisiana, an area known for drug-related activity. Investigators were told that "Fella," as Elbert Ratcliff was known in the area, was involved with the murder. Jefferson Parish Sheriff's Office (JPSO) personnel found the fingerprints on business cards found in Mr. Adams' cab matched Mr. Ratcliff's fingerprints. Once apprehended, Mr. Ratcliff told JPSO that Defendant, Teddy Chester, shot Mr. Adams. Defendant insisted he was only trying to sell the victim fake drugs, but Mr. Ratcliff shot the victim while trying to rob him. A grand jury indicted both Defendant and Ratcliff for the murder of Mr. Adams in April of 1996.

On May 14, 1997, after a two-day trial, a jury found Defendant guilty of first degree murder, in violation of La. R.S. 14:30, and, two days later, recommended he be sentenced to death. Defendant unsuccessfully challenged his conviction and

death sentence in the state courts. Having exhausted all avenues of relief in the state court system, Defendant filed a federal petition for a writ of habeas corpus under 28 U.S.C. § 2254(d). On June 11, 2018, the federal court granted the writ and ordered the State of Louisiana to either retry Defendant or to release him from state custody within the following 120 days. See *Chester v. Vannoy*, 16-17754, 2018 WL 2970912, at *1 (E.D. La. June 11, 2018).

On August 16, 2018, the State amended the 1996 indictment to charge Defendant with second degree murder. On September 13, 2018, a Jefferson Parish Grand Jury indicted Defendant with second degree murder in violation of La. R.S. 14:30.1, and Defendant was arraigned and pled not guilty. On October 1, 2018, the United States District Court for the Eastern District gave the State until November 15, 2018, to retry Defendant.

Defendant's trial began on October 29, 2018.

Nancy Clary, the designated representative for the custodian of records for the Jefferson Parish Sheriff's Office (JPSO) 9-1-1 call center, testified that on December 27, 1995, at 6:15 a.m., a 9-1-1 call came in from 713 Calhoun Street and the 9-1-1 caller advised that there was a cab parked across the street with its motor running, doors open, and lights on.

Robert Murphy, a retired JPSO deputy, testified that on December 27, 1995, he responded to the call regarding an abandoned vehicle in the area around 713 Calhoun Street. When Mr. Murphy, who was less than two minutes away, arrived at that location, he observed a Kenner cab leaning against a cement object, with its motor running, its lights on, and the driver-side door open. He observed through the open driver's door a white male, later identified as John Adams, slumped in the driver's seat with his head back and a wound to the back of his head. Mr. Murphy secured the crime scene, called for Emergency Medical Services, and notified the detective bureau, the crime scene division, and his supervisor.

Mr. Murphy testified that there were cards, including King Cab business cards, a lottery ticket, miscellaneous pieces of paper on the ground outside of the cab, business cards on the floor of the vehicle on the driver's side, and a photograph lying on the victim's left thigh. Mr. Murphy testified that the rear driver-side door was slightly ajar and that there was red liquid pooling in the rear seat area on the floor. He further testified that there was a plastic bag hanging on the interior handle of the driver-side rear door and that the bag contained a long sleeved Guess t-shirt with tags on it.

The trial court qualified Dr. Fraser MacKenzie, who performed the autopsy of Mr. Adams, as an expert in the field of forensic pathology. Dr. MacKenzie testified that the cause of death was a gunshot wound to the head and that the manner of death was homicide. Dr. MacKenzie explained that the firearm was held firmly against the skin as it was fired. He described the trajectory of the bullet as having traveled from the lower left back side of the head to the upper-right front side of the head. Dr. MacKenzie testified that a projectile and its copper jacket were recovered from just inside the victim's head and fragments of lead were removed from the skull.

JPSO Lieutenant Ralph Sacks was the lead detective on the case. Lt. Sacks testified that he learned that on December 27, 1995, at approximately 4:00 a.m., someone called the cab company from a pay phone and requested to be picked up at 713 Calhoun and taken to Susan Park, a neighborhood in Kenner. He stated that he canvassed the Calhoun Street area but could find no eyewitnesses to the shooting. He discovered that Mr. Adams had $34.00 in his left shirt pocket and $260.00 in his wallet, but his pouch was missing. He also stated that he met with Mr. Adams' mother, Hazel Adams, who told him that Mr. Adams kept cards in his pouch.

Lt. Sacks explained that the people at 713 Calhoun initially did not provide any helpful information, but a "guy named Franklin" later told him Elbert Ratcliff, also known as "Fella," visited the home from time to time. During Lt. Sacks' investigation, at least two other individuals named "Fella" as a possible suspect. Lt. Sacks asked the crime lab to compare the fingerprints on the business cards found at the crime scene to Mr. Ratcliff's fingerprints, and the prints matched.[1] He subsequently obtained an arrest warrant for Mr. Ratcliff and a search warrant for his residence at 525 Richard, Apartment 1 in River Ridge. Lt. Sacks testified that Ratcliff's last known residence was in close proximity to the scene of the homicide. On March 5, 1996, Lt. Sacks informed Mr. Ratcliff's father of the warrant for his son's arrest but no items were seized during the search of the home. Later that day, Mr. Ratcliff contacted Lt. Sacks and was subsequently arrested for first degree murder.

Lt. Sacks recalled that Mr. Ratcliff implicated Defendant, Teddy Chester, in the homicide on the way to the detective bureau. Once Mr. Ratcliff arrived at the detective bureau, he was advised of his Miranda rights, which he waived, and then he gave a statement. Lt. Sacks presented a photographic lineup to Mr. Ratcliff containing Defendant's picture, and Mr. Ratcliff positively identified Defendant. He recalled that Mr. Ratcliff acknowledged handling the business cards at the crime scene and removing the pouch. Lt. Sacks attempted to locate Defendant as a person of interest using a flyer. Lt. Sacks acknowledged that Mr. Ratcliff, in the third of several recorded statements he made, identified Defendant as the person who shot John Adams. He later made contact with Defendant's family and advised them that he was looking for Defendant.

---

[1] Patricia Cole, who the trial court qualified as an expert in the field of latent print examination and identification, testified that the fingerprints on two of the State's exhibits matched Mr. Ratcliff's right thumb and left thumb prints."

19-KA-363                                                    4

Lt. Sacks testified that on March 18, 1996, police were dispatched to a residence regarding a disturbance. Earlier, Lt. Sacks' colleague, JPSO Lt. Vincent Bosco, testified that at approximately 9:00 a.m. that day, he responded to a call at 11108 Newton Street, Apartment C. The dispatcher had advised that a female caller was having problems with a male. When Lt. Bosco arrived, there were two females present. One of the females told him that the male inside was the one who killed the cab driver. He observed a black male dive headfirst out of the second-story window. He then got on the radio and advised headquarters so more units could respond and establish a perimeter to contain that individual. Lt. Bosco testified that the black male was later located, detained, and identified at 429 Upland Street. Lt. Sacks later testified that the male, identified as Defendant, was taken to the detective bureau along with Quinice Pollard, Defendant's girlfriend, and her sister, Kaprice Pollard.[2] The sisters gave the police aliases during initial contact but the police discovered their true identities and that they had warrants so they were arrested.

On that same day, before speaking with Defendant, Lt. Sacks obtained an arrest warrant for him and a search warrant for his residence at 308 Jackson Street in Kenner. He stated that when he went to Defendant's residence to execute the search warrant, no one answered the door. Lt. Sacks explained that he entered the home through an open window he found on the side of the house. During the search, Lt. Sacks retrieved items, including an Oakland Raiders baseball cap, a pair of jeans, and a letter. He believed that the cap and the jeans had blood on them.

Lt. Sacks testified that he went to JPSO's Homicide Division after executing the search warrant and advised Defendant of his rights on March 18, 1996. He further testified that Defendant waived his rights and then gave a statement.

---

[2] In this opinion, Quinice Pollard will be referred to as "Ms. Pollard" or "Quinice," and Kaprice Pollard will be referred to as "Kaprice."

In his statement, Defendant said that his date of birth was November 10, 1977, he was eighteen years old, and his highest level of education was eighth or ninth grade. He stated that in December of 1995, he walked along the tracks down Tullis Street and went to Calhoun Street where he saw "Fellow"[3] standing on the corner. Defendant said that he had known "Fellow" for a couple of years and that they had smoked a little "weed" in the past, but he did not know "Fellow's" real name. Defendant asserted that "Fellow" wanted to sell or trade a Guess shirt in a plastic bag for a "rock." He asked "Fellow" if "any money was coming around," and "Fellow" said "yes," so defendant continued to walk down the street.

Defendant believed "Fellow" was a crack cocaine user but that he had never seen him use it. He did not know what time it was, but he recalled that it was dark outside and that the club had closed early. He did not see anyone else out on the street at that time. Defendant said that he started walking toward Airline from the tracks and that by the time he made it "down," the cab driver was coming down Calhoun Street. He thought the cab driver was "looking for some drugs." Defendant recalled that the cab driver stopped and was trying to say something, so Defendant opened the "back passenger door" and asked him what he wanted. He said that when he opened the door, he put one foot in and left the other foot "hanging out." Defendant then stated that he pulled the door closed to make it look like he was in the cab "so no police could a stop or nothing." Defendant asked the cab driver if he was looking for anything, and the cab driver told him "no," so Defendant got out of the cab. Defendant noted that the cab driver pulled further down the street and then turned around and came back. He said that was when he saw "Fellow" just "pop up" behind him asking if the cab driver wanted anything. Defendant told "Fellow" "no," but "Fellow" still wanted to see on his

_____

[3] It is noted that Mr. Ratcliff's nickname was "Fella," also spelled as "Feller" and "Fellow" throughout the record and this opinion also.

own if the cab driver wanted something. He asserted that "Fellow" stopped the cab driver and got completely in the cab directly behind the cab driver. Defendant recalled that the cab driver started pulling off slowly and he saw that "Fellow" had a gun up to the back of the cab driver's head. Defendant told Lt. Sacks he saw the cab driver struggling to move the gun from behind his head. He then saw "Fellow" reach up and pull the radio out.

Defendant stated that the cab speeded up and that was when he heard a "pow" and saw a flash inside the cab. He thought that after "Fellow" shot the cab driver, the cab driver must have lost control of the cab, and it went straight into a pole. "Fellow" was in the car when it crashed. Defendant asserted that "Fellow" then got out of the back of the cab and opened the driver-side front door. He believed "Fellow" was checking the cab driver to see if he had "anything on him." Defendant saw "Fellow" "fooling around with something," but he did not know what it was. He subsequently observed that "Fellow" "ducked off" behind a tree. Defendant estimated he was approximately fifteen to twenty feet away from "Fellow" when he observed this. He recalled that the cab driver was a "fat guy" with white hair and glasses.

Defendant stated that he got behind a tree and attempted to hide from "Fellow." "Fellow" then ran towards a "cut" to the next street. Defendant recalled that before "Fellow" got to the "cut," he stopped, called him, and waved the gun in defendant's direction. Defendant said that the gun was a black .38 revolver. "Fellow" pointed the gun in his direction and said to "come on." Defendant told him "no," but when "Fellow" said it again in an aggressive way, defendant went with him. He recalled that he and "Fellow" were running and that "Fellow" was holding Defendant's jacket by the shoulder and pulling Defendant along with him. Defendant stated that after they went over the tracks, "Fellow" told him that if he told anyone about what had happened, he would kill Defendant, Defendant's "old

lady," and her baby. He said that "Fellow" ran one way and that he ran straight to his sister's house on Jackson Street.

No one was home when Defendant arrived, but he eventually told his girlfriend what happened. He further stated that his "old lady" came back several times and said that "Fellow" had told her that "if Defendant opened his mouth about something, there was going to be 'some drama or something'" between "Fellow" and Defendant.

Defendant said he did not see if "Fellow" got any blood on him when the shooting happened. Defendant denied having any blood on his clothes. He remembered that he was wearing "some green Girbaud," a black sweater, and a black jacket. Defendant also remembered that he was wearing a "Dallas" baseball cap. He guessed that "Fellow" left the plastic bag containing the shirt in the cab because when "Fellow" went to the cab, he had the bag, and when "Fellow" came back from the cab, he did not have anything in his hand. He said that "Fellow" told him that one of his friends had given him the Guess shirt.

Defendant reiterated that when he first saw the cab driver, he approached the cab because he thought the cab driver might want to buy some crack cocaine that Defendant was trying to sell. Defendant asserted that there were "a lot of cabs that buy crack." He insisted that no one else was out there and "no money was coming around," so he was going to leave. He did not know how the cab driver came to be back there.

Lt. Sacks testified that after Defendant gave his statement, he confronted Defendant with details of the case and the evidence he recovered from Jackson Street. As a result, Defendant then provided him with a second (recorded) statement. In that second statement, Defendant said that "Fellow" stopped the cab driver on Calhoun Street and got into the back seat directly behind the cab driver. Defendant said he ran around to the right rear passenger door and got in with one

foot in and one foot out. After he got in, Defendant asked the cab driver if he wanted anything, and the cab driver said, "no." He said that "Fellow" "pretended" to ask the cab driver if he wanted something, but the cab driver said he did not do anything like that. Defendant explained that "Fellow" then said, "well Mother F*cker give it up," and "Fellow" placed the gun to the back of the cab driver's head. He further explained that the cab driver tried to move the gun away from his head.

Defendant recalled that the cab driver said, "ohh Lord not this, not this," and that the cab slowly pulled off. Afterwards, "Fellow" reached up and pulled out the radio because the cab driver was reaching for it. Defendant stated that the cab driver sped up and that is when the flash went off. He further stated that the cab driver fell back to where his head was leaning over the front part of the seat to the back and that was when blood started dripping over Defendant's left pant leg and splattered on his arms, hands, jacket, face, hat, and "all over" his legs. Defendant recalled that after the cab driver was shot, the cab continued to move until it ran into two small poles. He stated that "Fellow" then jumped out of the cab and began "checking the man" and his pockets. Defendant said he scooted across the seat and got out of the cab on the same side as "Fellow," the driver-side left rear door, and he ran and hid behind a tree. He saw some cards on the ground after he jumped out. Defendant thought they stayed in the cab for approximately ten minutes.

Defendant stated that "Fellow" ran toward a "cut" to the next street and made him run with him. He also stated that "Fellow" told him that if he said anything about what happened, he would kill his "old lady" or other family members. He asserted that he was wearing blue jeans that night and a black and white Raiders hat. Defendant denied having a gun that night.

Defendant said that after the shooting, he went to his sister's house at 308 Jackson Street. He took a bath and put his clothes in a dirty clothes basket.

Defendant said that he left the clothes there and that after a while, his "old lady" washed them. He stated that she asked him where all the blood had come from, and he told her that "Fellow" had shot somebody. Defendant claimed that he did not know what happened to the gun used in the shooting. He explained that he did not tell the police this information before because he thought by him being in the cab and getting blood on him, he was "gonna be accused of being a part of it."

Defendant did not know if "Fellow" or someone else called the cab, but he insisted that he did not. He stated that he did not know what "Fellow" was going to do when they got into the cab.

Defendant contended that all he was trying to do was "make a little hussle [sic]" and to see if he could make some money when suddenly the gun was produced, and he just "fell into shock." He recalled "Fellow" telling him that he left the Guess shirt in the cab. He stated that he did not tell anybody what happened because of "Fellow's" threats to kill his family and because of his probation. He explained that he ran that morning because he thought his "old lady daddy" had called the police about him.

Defendant indicated that his girlfriend wore his hat and that he did not wash it. He admitted that the blood should still be on the hat. He reiterated that when he got in the cab, he thought that it was going to be a drug sale, "me making a lil money or him making a lil money [sic]." Defendant said that he did not touch the cab driver's pockets and that the only things he touched were the outside and the inside of the door handles. He believed that "Fellow" sold drugs there before and that he had seen other cab drivers buy drugs there. He thought the victim was the cab driver who had gone back there to buy drugs before and that was what "really keyed" him onto trying to sell drugs to him. Defendant stated that if the cab driver had wanted to buy drugs, he would have sold him some "fake" crack cocaine. He explained that he himself did not buy the Guess shirt from "Fellow" because all he

had were "fake" drugs, and he did not have enough money. Audiotapes of both statements were played at trial and jurors were provided with copies of the transcripts.

Lt. Sacks testified that he arrested Defendant after taking his statements. He requested scientific testing on Defendant's clothes, and he obtained a search warrant for Defendant's blood. Lt. Sacks recalled that Defendant was uncooperative and that Defendant said he had already told Lt. Sacks that the blood on the cap was the cab driver's blood. He noted that the murder weapon was never recovered.

On cross, Lt. Sacks acknowledged that the first statement Mr. Ratcliff gave was "full of demonstrable lies" and that "some of" his second statement was true and some of it was demonstrably false. Lt. Sacks also agreed that he did not find any drugs, drug paraphernalia or firearms when he searched Defendant's sister's home.

In December of 1995, Donna LaRocca worked as a cab driver and as an office manager for King Cab. She testified that she called the JPSO when she saw an article in the newspaper that said the two individuals arrested for the murder of the cab driver said that they had never been in "the cab" before. She told the JPSO that those two individuals rode in her cab both before and after the victim's murder. Ms. LaRocca remembered a time, about a week after the victim's death, when she picked up the two men, black males in their early twenties, from 525 Richard Street and took them to Farrar in Kenner. Ms. LaRocca asserted that she had picked both of the men up from 525 Richard before. She said that all the drivers were "kind of nervous" but she told the men when they called back that she "personally would come and get them" because "we picked them up all of the time." On the way, they questioned Ms. LaRocca about what the police knew

about the murder. She replied that the police were only telling them that they intended to offer a reward.

Later, a detective showed Ms. LaRocca two sets of photographic lineups. She positively identified number five in a photographic lineup as an individual whom she had picked up from 525 Richard numerous times. She learned the man who lived at 525 Richard and had called for the ride was named "Elbert Ratcliff." In the second photographic lineup, although she was able to narrow it down to two choices, Ms. LaRocca did not positively identify a suspect. Ms. LaRocca was sure, however, that the two suspects whose pictures appeared in the paper were the two men in her cab that day.

Quinice Pollard testified that she was eighteen years old when she first met Defendant at a club in October of 1995 and started dating him. She lived on Newton Street in River Ridge with her then two-month old daughter and her sisters at the time. Ms. Pollard stated that she sometimes stayed with Defendant on Jackson Street where he lived with his sisters. Ms. Pollard testified that Defendant helped to support her using money he received from a job at a car wash, a government check for an intellectual disability, and from dealing drugs, particularly crack cocaine. She recalled that Defendant always wore his gray and black Raiders hat.

Ms. Pollard testified that Defendant "hung out" with Mr. Ratcliff who was also known as "Fella." She knew Mr. Ratcliff, who used and sold drugs, before she knew Defendant. She further described Defendant and Mr. Ratcliff as friends and said that Defendant used Mr. Ratcliff to "run" or sell drugs for him. Ms. Pollard clarified that Defendant and "Fella" sold drugs together, Defendant was the "head" drug dealer, and Defendant was not intimidated by "Fella."

In December of 1995, Ms. Pollard and defendant were still dating but had an on-again, off-again relationship. Ms. Pollard explained that one time, when she

went to his residence to do his laundry, she saw a lot of blood on some of his clothes. She maintained that she did all of Defendant's laundry while they were dating. She asked Defendant about it, and he responded that the blood came from him and a "guy" whom he had gotten into an altercation with in a club, noting that he had to pistol whip the "guy."

Ms. Pollard testified that she first heard about the cab driver's murder from her sister, Kaprice. Ms. Pollard saw Defendant at a corner store in her neighborhood soon after, and Defendant said that he wanted her to come to his Jackson Street residence so they could talk. She asked him at the store if he knew anything about the murder, and Defendant told her "no." Ms. Pollard testified that she visited Defendant at his residence a few days later. Defendant sat her down at the kitchen table and told her that he was involved in the cab driver's murder. Defendant told her that he was there, and "the other guy" did it, but he asked her to say that she was with him at the time of the incident in order to create an alibi.

Ms. Pollard recalled that Defendant had a gun when he told her this information. She had seen the gun before which she described as a .38 revolver and that it was the type of gun "that you put the bullets in." She described the gun's brown handle, "tint-color" chrome "nose", and "wheel." Ms. Pollard indicated that defendant kept that gun in a small box or under the mattress. Defendant pointed the gun at her, and Ms. Pollard testified that she was nervous and scared and told him she would say he was with her. She recalled that Defendant played with that gun "a lot" and the gun had gone off while Defendant was playing with it before.

After that conversation, Ms. Pollard returned to her apartment and told her sister, Kaprice, that Defendant had some involvement in the cab driver's murder. Ms. Pollard recalled that Defendant subsequently came over to her apartment on a daily basis asking if she had told anyone about his involvement in the murder. She testified that she and Defendant talked again about the murder and Defendant told

her three or four versions of what happened. The first version was the one where he was at the scene of the crime, "Fella" shot the victim, but Defendant asked her to provide an alibi for his whereabouts at that time. The second version was that he and "Fella" were there to rob the cab driver and that "Fella" did it. The third version was that "Fella" did it. The fourth version was that Defendant and "Fella" were robbing the cab driver, Defendant put the gun to the cab driver's head, and then the gun accidentally went off, and the blood got all over his clothes. Ms. Pollard testified that she believed that Defendant accidentally shot the victim because that was the version of events that sounded believable when Defendant told it to her. She also noted that Defendant provided the most detail in his fourth version. Ms. Pollard stated that Defendant asked her again to be his alibi. Defendant also told Ms. Pollard that if "Fella" came to her looking for Defendant that she should say she had not seen him.

The night before police came to her house to arrest Defendant, Ms. Pollard recalled that Defendant had his gun with him and that he told her he was going to California. Defendant asked her to go with him, but Ms. Pollard said she had no reason to go and asked him to leave. Just as he was leaving, it started to rain, so Defendant spent the night.

Ms. Pollard testified that, the next morning, she woke up to JPSO coming through her house with dogs. Defendant dove out the window of her second-floor apartment. Ms. Pollard later saw the police bring Defendant out of a house around the corner. Ms. Pollard admitted that she did not go back to her apartment because she was on probation for a felony plea and knew she could be arrested. She instead went to Defendant's home on Jackson Street to "see if I [had] anything in that house" but the police were there waiting when she arrived. The police later brought Ms. Pollard to the police station. Ms. Pollard was reluctant to cooperate; she did not tell the police everything, but she did tell them about the gun and that

she was not involved in the murder. She further testified that "[it] was a lot going on the interrogation room," but the police did not hit her, or tell her what to say, and she went to jail due to an attachment from a misdemeanor case.

Ms. Pollard also testified that she remained in touch with Defendant after he went to jail. She visited and talked on the phone and exchanged letters with Defendant. In his letters to Ms. Pollard, Defendant asked her to ask her sister and others for help. Defendant also asked her to change her statement and to not go to court. Ms. Pollard explained that she wanted to believe Defendant did not commit the murder, so she continued to communicate with him even after he began to send her threatening letters. Those threatening letters, eight of which were admitted into evidence at trial, led Ms. Pollard to believe that Defendant may try to kill her, so she eventually severed contact with Defendant.

Ms. Pollard further testified that Defendant asked her to burn the letters, but she did not do so. Because she was afraid of Defendant, Ms. Pollard recalled that she wrote him many letters telling him how much she loved and missed him, although at some point she began dating someone else. Ms. Pollard became pregnant in November of 1996 with another man's child and had her second daughter in July of 1997. By then, she and Defendant were no longer exchanging letters with one another.

From March 18, 1996 until September of 2018, Ms. Pollard testified, no one asked her to tell the whole story of what happened until the Assistant District Attorneys (ADAs) asked. Ms. Pollard insisted that the ADAs did not pressure her and she never called for the reward money nor ever received any reward. Ms. Pollard admitted that she had prior convictions of misdemeanor disturbing the peace in 1994, possession with intent to distribute cocaine in 1994, and felony theft of goods in 1998. She also testified that there were several attachments for her arrest in March 1996 due to missed court dates and that she was on two years of

probation for the cocaine conviction at that time. Ms. Pollard also attributed any proposed discrepancies in her testimony between the two trials to not wanting to be involved and not wanting Defendant to be in trouble or die.

Defendant also placed approximately 165 pages of Ms. Pollard's letters to Defendant into evidence. In the excerpts selected for Ms. Pollard to read, she professed her love for Defendant, promised to pray for him, expressed appreciation for his support, and asked him not to entertain other women. Ms. Pollard also read excerpts from their letters to one another where they referred to one another as "wife" and "husband," and to Ms. Pollard's child as their child.

At the conclusion of Ms. Pollard's testimony, she confirmed that she did not feel safe when Defendant sent letters that said he was "going to kill" her and that he could send someone to her apartment "to show [her] and just to let [her] know that he could get to [her]". She also reiterated that Defendant and "Fella" sold drugs together and that Defendant was not intimidated by "Fella."

Anthony Curtis testified that he was incarcerated for conspiracy to distribute cocaine and was serving a 240-month sentence. He recalled the killing of a cab driver in December of 1995 on Calhoun. Mr. Curtis explained that he was out riding with a friend and thought he heard gunshots, but he was drunk and "kind of high" on marijuana at the time. Mr. Curtis did not see where the gunshots came from, but he saw the cab. He testified that he saw afterwards that the cab driver had been shot in the cab and that there were a lot of people out there. Initially, Mr. Curtis asserted that he could not remember if he saw anyone exit the cab at the time of the gunshot. However, he read his affidavit dated September 23, 2013 to refresh his memory; he told the investigator then that he had seen "Teddy" and "Fella" exit the cab after the gunshots. Mr. Curtis knew Defendant and had seen him around before. Mr. Curtis further testified that he thought that he saw Defendant or "Fella" with a weapon, but he was not sure. Later, on redirect, Mr.

Curtis insisted that he did not remember whether he saw Defendant and "Fella" jump out of the cab that day.

Bonnie Dubourg was qualified by the trial court as an expert in the field of forensic serology—the identification of biological fluids. Ms. Dubourg previously worked for JPSO and testified that she tested samples from Defendant's jeans and Raiders baseball cap. The stains on the left and right legs of the jeans tested negative for the presence of blood. She further testified that that the three small stains on the inside bill of Defendant's cap tested positive for the possible presence of blood. Due to the insufficient sample sizes, she did not conduct further analysis. Ms. Dubourg recalled that she tested the Guess t-shirt "Fella" was trying to sell that night and that the examination of the "loose crust blood-like substance" on the shirt yielded a positive serological test for Group O blood. She explained that, again, the insufficient sample size precluded further analysis. Ms. Dubourg testified that the victim's blood type was O and that Defendant's blood type was A.

Anne Montgomery worked for GenTest Laboratories in the 1990s and testified that she was responsible for "the forensics department and those testing and reports and testimony." The trial court accepted her as an expert in the fields of molecular biology and DNA analysis. Ms. Montgomery testified that she conducted DNA testing in the instant case in 1996. She indicated that she obtained samples from the baseball cap and reference samples from the victim and Defendant. Ms. Montgomery testified that the DNA test results for the cutting from the bill area of the baseball cap and the cuttings from the inside of the baseball cap were consistent with a mixture of the reference blood sample from the victim and Defendant, and therefore, neither the victim nor the defendant could not be excluded as DNA donors.

Ms. Montgomery explained that the data suggested there was a minor contributor and a major contributor. She testified that she looked at two genetic

markers to generate population frequencies.  She further explained that approximately one in 339 Caucasian individuals would have those two genetic markers in their profile if she looked at random Caucasian individuals and that one in 707 Hispanic individuals would have those genotypes if she randomly tested that population. Ms. Montgomery noted that those two genotypes were rarer in the Black/African-American population than they were in the Caucasian population. Ms. Montgomery testified although DNA testing in 2018 was much more discriminating than in 1996, she did not feel that that 2018 testing invalidated or negated the earlier results in any way.  Ms. Montgomery concluded that those tests used to analyze the samples in 1996 were accurate and state of the art at the time.

Elaine Schneida, JPSO's DNA Laboratory Director, was accepted as an expert in the field of forensic DNA analysis.  Ms. Schneida testified that she conducted further testing in August of 2018 on the Raiders baseball cap and the denim jeans.  She stated that she tested several different locations on the baseball cap for possible blood, but the tests were all negative. She acknowledged that there was a positive result for blood on the baseball cap previously but explained that either the sample was consumed or it degraded over time.  Ms. Schneida further stated that she also tested the jeans for possible blood, but all of the spots were negative.  She did not know how the evidence was stored but noted that extreme heat and/or exposure to humidity or moisture, or light could degrade DNA.   Ms. Schneida stated that the results she obtained did not invalidate the prior positive result.

Ms. Schneida testified that she also performed a DNA extraction on cuttings from the baseball cap and the jeans. She asserted that the partial DNA profile obtained from the cutting from the stain on the exterior right front pocket of the jeans was consistent with being a mixture of DNA from at least two individuals, one major contributor and at least one minor contributor. Ms. Schneida further

asserted that the victim was excluded as the major contributor to the DNA in this mixture. She testified that, due to the complexity of the mixture, the profile was determined to be uninterpretable for inclusionary purposes, and therefore, no conclusion could be made regarding the contributor status of Defendant. She was also unable to develop any sort of profile from the baseball cap. Ms. Schneida explained that the 2018 testing was not inconsistent with the findings from 1996 because they tested different sections of the jeans and cap – the samples tested in 1996 were no longer available for her to test.

Louise Walzer is a retired forensics firearm and toolmark examiner who was recognized as an expert in her field by the trial court. She conducted an examination on one large lead-like fragment, four small lead-like fragments, and an unknown caliber copper jacket obtained from the victim during the autopsy. Ms. Walzer concluded that the jacket was a .38 caliber class ammunition which was more consistent with a .38 special or a 357 revolver. She noted that the jacket in the instant case could not have been shot from the three weapons JPSO secured, clearing other possible suspects JPSO found during their investigation.

Albert Majeau, an investigator for the Jefferson Parish District Attorney's Office, testified that, in August of 2018, he collected the jeans and the cap from the Jefferson Parish Clerk of Court's evidence custodian's warehouse and brought them to the District Attorney's Office where they were locked in their climate controlled evidence room. Later that month, he picked up the jeans and the cap from the DA's evidence room and delivered them to the Jefferson Parish Crime Laboratory.

JPSO Chief Deputy Timothy Scanlan, commander of the technical services bureau, oversaw the crime lab, the crime scene division, the DNA lab, records, and the 9-1-1 call center. He informed the trial court that he still performed firearm and toolmark examinations, crime scene reconstruction, and bloodstain pattern

analysis. He was accepted as an expert in the fields of crime scene reconstruction and bloodstain pattern analysis.

Deputy Scanlan testified that he was not employed with the JPSO in 1995; however, he reviewed the lab reports, the autopsy report, and the crime scene photos in the instant case. He concluded that the victim was shot in the back of the head from the rear of the car going forward. Chief Deputy Scanlan also concluded that there was post-attack activity after the bloodshed occurred. He noticed that there was a lot of "stuff" out of place inside and outside of the car and that the items had been rummaged through. He explained that the victim did not move around in the car after he was shot but that there was someone who got an accumulation of blood on himself and then transferred the blood around the car as he moved from the front of the car rearward.

Chief Deputy Scanlan reviewed the crime scene photographs and testified that although the victim's injury was consistent with the shooter being in the rear seat, he could not tell whether the shooter was in the driver-side or passenger-side rear seat. He mentioned that a subtle change in the position of the victim's head would have changed the angle fairly significantly and that he could not tell whether the victim moved immediately before he was shot. Chief Deputy Scanlan also testified that he examined the Raiders baseball cap. He explained that there were small amounts of blood on the cap that were "nondescript stains," meaning that those stains could be spatter stains where blood was projected or flung after the shooting, or they could be non-spatter stains where the blood was transferred. Chief Deputy Scanlan testified that he thought the cap had to be off of the head because the blood stains were underneath the cap. He stated that the cap could have been off the head lying down or taken off with bloody hands or that blood could have been flung onto the cap.

After the State rested its case, the defense called Elbert Ratcliff as a witness. Mr. Ratcliff testified that he was convicted of second degree murder as a principal for the killing of Mr. Adams and was serving a life sentence. Mr. Ratcliff advised that he was diagnosed as a schizophrenic around age eleven or twelve. He also disclosed that he smoked crack every day in his twenties, but still takes Haldol. Mr. Ratcliff knew people who lived at 713 Calhoun but he did not "hang out" there. He asserted that people sold drugs on Calhoun and that he was on that street "a lot." Mr. Ratcliff stated that those were not his fingerprints at the crime scene, that he was not present on Calhoun when the victim was murdered, and that he had not been at the crime scene. Mr. Ratcliff also insisted he did not call King Cab that night to go from Calhoun to Susan Park because he was in Destrehan with his cousin, and he also had a car with full insurance. He also testified that he was not a regular customer of King Cab and Ms. LaRocca lied when she said that she had seen him in her cab before.

Mr. Ratcliff testified that he only said what the police told him to say. He explained that the police wanted him to say that he was at the scene or had seen the deceased victim. He also stated that the police told him that he was going to be able to go home, that they knew he did not commit the crime but wanted him to point the finger at someone else, that they knew who did it, and that if he did not tell them who that person was, he would be booked with first degree murder.

Mr. Ratcliff claimed that everything he told the police was a lie except when he told them the first time that he was not at the scene. Mr. Ratcliff acknowledged telling the police that he saw the victim after he died and that he went through the victim's "stuff." He admitted that he told the police during his first statement that he was "high." Mr. Ratcliff denied that he and Defendant were partners, or friends, and he testified that they did not "hang out" together. He explained that he

had chased Defendant off of Calhoun a couple of times trying to "jack" Defendant and get drugs from him.

Mr. Ratcliff testified that the police wanted him to say in his third statement that he saw the victim get killed, and he recalled telling Lt. Sacks that Defendant shot the victim. Mr. Ratcliff claimed that he implicated Defendant because he had heard "on the street" that Defendant shot the victim. Mr. Ratcliff denied signing the photographic lineup identifying Defendant as the shooter. He also did not recall telling the assistant district attorneys that he saw Defendant shoot the victim that night.

After the defense rested its case, the State called Lt. Sacks as a rebuttal witness. Lt. Sacks testified that he met with Mr. Ratcliff at the detective bureau, told him he was under arrest for first degree murder, and advised him of his rights. He indicated that Mr. Ratcliff waived his rights and gave several statements. Lt. Sacks asserted that he did not tell Mr. Ratcliff he could go home if he pointed the finger at someone else. He testified that Mr. Ratcliff told him that he saw Defendant shoot the victim. Lt. Sacks stated that he showed Mr. Ratcliff a photographic lineup and Mr. Ratcliff positively identified Defendant as the person who shot the victim. Lt. Sacks thought Mr. Ratcliff was "coherent" when JPSO took his statements and he did not know that Mr. Ratcliff was diagnosed with schizophrenia as a young child. Lt. Sacks recalled that the first time he heard of Defendant was in the car when he was taking Mr. Ratcliff to jail and Mr. Ratcliff gave him Defendant's name. Lt. Sacks emphasized that Mr. Ratcliff's name came up several times in his investigation as someone involved in the shooting, but he did not know who Defendant was and Defendant's name had not come up in the investigation prior to Mr. Ratcliff mentioning it.

Six days after the trial began, a twelve-person jury unanimously found Defendant guilty of second degree murder. On December 12, 2018, Defendant

filed Motions for New Trial, to Bar a Life Without Parole Sentence for Adolescents as Unconstitutional, and for Post-Verdict Judgment of Acquittal that were denied on that same date. The trial court also sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant filed a Motion to Reconsider Sentence that was denied on February 8, 2019. Defendant then timely filed a Notice of Appeal that was granted on March 14, 2019.

On appeal, Defendant asserts eighteen assignments of error and argues that, if not individually, the cumulative errors require his conviction and sentence to be reversed.

*ASSIGNMENTS OF ERROR NUMBER ONE*

There is insufficient evidence to support a jury's finding of second-degree murder.

*DISCUSSION*

In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-674 (La. 6/29/01); 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); *State v. Earls*, 12-448 (La. App. 5 Cir. 12/11/12); 106 So.3d 1149, 1154, *writ denied*, 13-132 (La. 9/20/13); 122 So.3d 1012. Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15); 169 So.3d 493, 500, *writ denied*, 15-685 (La. 2/26/16); 186 So.3d 468. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *Id.*

Defendant argues that the evidence was insufficient to support his second degree murder conviction. He contends that there was no direct evidence that he shot or attempted to rob the victim, and no physical evidence that connected him to the crime scene, and therefore, the State's case was strictly circumstantial. Defendant asserts that the physical evidence was consistent with Mr. Ratcliff being the shooter, getting blood on his hands, and rummaging through the front of the cab in an attempt to rob the victim. He further asserts that the forensic evidence shows that Mr. Ratcliff was sitting behind the victim in the rear driver-side seat when the victim was shot in the left back of the head and that Defendant was sitting in the rear passenger-side seat.

Defendant also argues that Ms. Pollard's testimony was not credible or reliable because she lied to the police during her interrogation and because she had an interest in testifying favorably for the State. Defendant contends that Mr. Ratcliff was a violent, drug addicted, mentally ill man, and therefore, his statements to the police were not credible or reliable. He maintains that there was no evidence that he and Mr. Ratcliff planned to rob the victim, or that he had a weapon, or knew Mr. Ratcliff had a weapon.

The State responds that it presented sufficient evidence to sustain Defendant's conviction for second degree murder. It further responds that Defendant's claim that there was no direct evidence that he shot or attempted to rob the victim is untrue. The State points out that he admitted to Quinice Pollard that he was attempting to rob the victim and that while he was holding the gun to the victim's head, it "accidentally" went off. It contends that confessions are considered to be direct evidence of guilt, citing *State v. Faciane*, 17-224 (La. App. 5 Cir. 11/15/17); 233 So.3d 195, 207, *writ denied*, 17-2069 (La. 10/8/18); 253 So.3d 797.

The State further contends that Ms. Pollard's testimony was sufficient to

sustain the conviction. It argues that even if Defendant "accidentally" shot the victim and thus did not have the specific intent to kill or to inflict great bodily harm upon Mr. Adams, by Defendant's own admission to Ms. Pollard, he was committing either an armed robbery or an attempted armed robbery of Mr. Adams which resulted in Mr. Adams' death. Thus, the State argues that, under either theory of second degree murder, the evidence was sufficient to support the conviction.

The State also asserts that Defendant seeks to exculpate himself by claiming that the forensic evidence supports his innocence; however, the State argues that the forensic evidence was entirely consistent with Defendant's guilt. The State maintains that evidence other than Ms. Pollard's testimony puts Defendant at the scene, including Mr. Adams's blood on defendant's baseball cap and Defendant's statements to Lt. Sacks wherein he placed himself at the scene and acknowledged being in the cab and getting Mr. Adams' blood on his baseball cap. The State also responds that Defendant's claims regarding Ms. Pollard's inconsistencies, motives, and other supposed issues with her testimony were explored by Defendant at trial, yet the jury chose to find her credible and unanimously found Defendant guilty as charged.

In cases involving circumstantial evidence, the trial court must instruct the jury that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99-3342 (La. 10/17/00); 772 So.2d 78, 83; *State v. Washington*,

03-1135 (La. App. 5 Cir. 1/27/04); 866 So.2d 973, 977.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 203, *writ denied*, 09-1305 (La. 2/5/10); 27 So.3d 297. A reviewing court may impinge on the fact-finder's discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Harris*, 02-1589 (La. 5/20/03); 846 So.2d 709, 713 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)).

Defendant was convicted of second degree murder, which is defined in La. R.S. 14:30.1 as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05); 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06); 944 So.2d 1277. Here, the written jury charges, signed by the trial judge, reflect that the jury was informed it could convict Defendant under the theory that he had the specific intent to kill or inflict great bodily harm upon the victim or because Defendant was engaged in the commission or attempted commission of an armed robbery.[4]

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences

---

[4] Armed robbery is defined in La. R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

Attempt is defined in La. R.S. 14:27 as "any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and, it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."

to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused as well as the extent and severity of the victim's injuries. *State v. Bone*, 12-34 (La. App. 5 Cir. 9/11/12); 107 So.3d 49, 58, *writ denied*, 12-2229 (La. 4/1/13); 110 So.3d 574. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *State v. Gonzalez*, 07-449 (La. App. 5 Cir. 12/27/07); 975 So.2d 3, 8, *writ denied*, 08-228 (La. 9/19/08); 992 So.2d 949.

Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. *State v. Knight*, 09-359 (La. App. 5 Cir. 2/9/10); 34 So.3d 307, 317, *writ denied*, 10-2444 (La. 10/21/11); 73 So.3d 376. Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. A defendant's act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. *State v. Bonilla*, 15-529 (La. App. 5 Cir. 2/24/16); 186 So.3d 1242, 1253, *writ denied*, 16-567 (La. 5/2/16); 206 So.3d 881, *cert. denied*, -- U.S. --, 137 S.Ct. 239, 196 L.Ed.2d 183 (2016).

In the instant case, the jury was instructed regarding the law of principals. Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime. *State v. Pierre*, 93-893 (La. 2/3/94); 631 So.2d 427, 428; *State v. King*, 06-

554 (La. App. 5 Cir. 1/16/07); 951 So.2d 384, 390, *writ denied*, 07-371 (La. 5/4/07); 956 So.2d 600.

An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. *King, supra*. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. *Id*. However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." *State v. Anderson*, 97-1301 (La. 2/6/98); 707 So.2d 1223, 1225 (per curiam). In *State v. Hill*, 98-1087 (La. App. 5 Cir. 8/31/99); 742 So.2d 690, 696-97, *writ denied*, 99-2848 (La. 3/24/00); 758 So.2d 147, this Court upheld the defendant's second degree murder conviction after the jury determined he was at least a principal to the crime. This Court determined that: 1) the defendant chose to remain with the co-defendant, at the murder scene, with knowledge, by his own admission, that his co-defendant planned to rob the victim; 2) the defendant did nothing to prevent the crime; and 3) the defendant did not come to the victim's aid after the shooting, but rather fled the scene. *See also State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09); 28 So.3d 442, 449-50, *writ denied*, 09-2684 (La. 6/4/10); 38 So.3d 299.

In the instant case, the State introduced evidence to show that Defendant either killed the cab driver or was at least a principal to the crime. Quinice Pollard testified that Defendant was her ex-boyfriend, that he and Mr. Ratcliff sold drugs together, and that Defendant was the "head drug dealer." She further testified that, although Defendant offered several explanations about what happened that early morning, she believed Defendant when he told her that while he and Mr. Ratcliff were attempting to rob the cab driver, Defendant put the gun to the cab

driver's head, and the gun accidentally discharged, and blood got on his clothes. Ms. Pollard testified that Defendant owned a revolver which she had seen before and had with him when he told her about what happened. She also testified that, while Defendant was incarcerated, he sent letters to her asking her to change her statement, to not present at court to testify, to talk to her sister about changing her statement, and to talk to other people about helping him out. Quinice also testified that in some of the letters, Defendant threatened to kill her or to send someone else to kill her if she betrayed him.

Lt. Sacks testified that Defendant gave a statement wherein he explained that he and Mr. Ratcliff got into the backseat of the cab, after which Defendant tried to sell fake drugs to the victim, and Mr. Ratcliff "pretended" to sell a Guess shirt. Defendant stated to Lt. Sacks that when the cab driver said he was not interested in buying anything, Mr. Ratcliff told the driver to "give it up." Defendant said that then the cab driver slowly pulled off and reached for the radio, after which Mr. Ratcliff shot him in the head. Defendant noted that the victim's blood got on his clothing. In his statement, Defendant said that after the shooting, they exited the vehicle, Mr. Ratcliff rummaged through the front seat and the victim's pockets. Defendant noticed some business cards on the ground. Lt. Sacks also testified that Defendant exclaimed that the blood on his cap was the cab driver's blood when Defendant tried to avoid having his blood sample drawn.

We find that the evidence is sufficient under the *Jackson* standard to support Defendant's second degree murder conviction. Similar to *Page*, *supra*, Defendant remained with Mr. Ratcliff at the scene, did nothing to prevent the crime, fled the scene rather than render aid to the victim, and did not attempt to report the shooting. Defendant, through statements to police and his girlfriend at the time, placed himself at the scene of the crime. Defendant's statement to the police was that he tried to sell "fake drugs" then Mr. Ratcliff attempted to sell the victim a

shirt, before Mr. Ratcliff shot the cab driver. Mr. Ratcliff testified that he only implicated Mr. Chester because the police told him to, but Lt. Sacks and Ms. Pollard testified that Defendant himself admitted he was involved. According to Ms. Pollard, Defendant said that he accidentally shot the victim, but also said that Mr. Ratcliff shot the victim. We find that the evidence is sufficient to establish that Defendant was either the shooter or a principal to the shooting. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03); 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04); 867 So.2d 688 and 08-1951 (La. 1/30/09); 999 So.2d 750. After listening to the testimony and considering all of the evidence, the jury found the State's witnesses more credible. It is not the function of the appellate court to assess credibility or re-weigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95); 661 So.2d 442, 443.

*ASSIGNMENT OF ERROR NUMBER TWO*

The trial court erred in admitting Mr. Chester's custodial statements.

*DISCUSSION*

The State has the burden of proving the admissibility of a purported confession or statement by the defendant. La. C.Cr.P. art. 703(D); *State v. Arias-Chavarria*, 10-116 (La. App. 5 Cir. 9/28/10); 49 So.3d 426, 433, *writ denied*, 10-2432 (La. 2/25/11); 58 So.3d 460. The trial court's denial of a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. *State v. Bellow*, 07-824 (La. App. 5 Cir. 3/11/08); 982 So.2d 826, 829.

Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove, beyond a reasonable doubt, that

the defendant was first advised of his *Miranda* rights, that he voluntarily and intelligently waived them, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises. *State v. Loeb*, 09-341 (La. App. 5 Cir. 2/23/10); 34 So.3d 917, 924-25, *writ denied*, 10-681 (La. 10/15/10); 45 So.3d 1110.

Defendant argues that the trial court erred by denying the motions to suppress his statements because of Defendant's limited intellect and diminished mental capacity, and because the State did not adequately prove that those statements were voluntarily and intelligently given and were not the product of coercion. Defendant's statements were made to detectives over a five-hour period. Lt. Sacks testified that Defendant, who had only turned eighteen years old a few months prior, arrived at the bureau at 11:00 am on March 18, 1996 and was advised of his *Miranda* rights by Deputy Rocky Burr. He further testified that he got Defendant something to drink and made bathroom facilities available if he needed them. Lt. Sacks said that he advised Defendant of his *Miranda* rights using a standard JPSO waiver of rights form. He said that he read the form out loud and gave Defendant an opportunity to read the form for himself and Defendant did not have any questions.

After Defendant signed the form, there was an unrecorded pre-interview, before he made a recorded statement. Lt. Sacks advised that Defendant did not ask to stop or ask for an attorney. Lt. Sacks spoke with Defendant again before taking another recorded statement and he testified that, again, Defendant did not request to stop or ask for an attorney. He further stated that he did not do anything to force, threaten, or coerce Defendant into making another statement.

Lt. Sacks testified that Defendant exclaimed, "I already told you that it was the cab driver's blood," while JPSO attempted to execute a search warrant to obtain a sample of Defendant's blood for comparative analysis. Lt. Sacks testified

that Defendant was not re-advised of his *Miranda* rights, but his statement, made before his blood was drawn, which defense counsel argues was involuntary and unreliable, was made prior to being held down by deputies and not in response to questioning.

A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. The admissibility of a confession or statement is a determination for the trial judge, and the judge's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Testimony of the interviewing police officer alone may be sufficient proof that a defendant's statements were freely and voluntarily given. *Arias-Chavarria*, 49 So.3d at 433.

In determining whether the trial court's ruling on the motion to suppress is correct, an appellate court is not limited to the evidence presented at the suppression hearing; it may also review relevant evidence presented at trial. *State v. Poupart*, 11-710 (La. App. 5 Cir. 2/28/12); 88 So.3d 1132, 1140, *writ denied*, 12-705 (La. 10/8/12); 98 So.3d 867.

In *State v. Doyle*, 11-597 (La. 3/23/11); 56 So.3d 948, 949, the supreme court ruled that a "defendant may introduce evidence of mental retardation, defect, and/or diminished capacity at the guilt stage of trial as part of the circumstances surrounding the making of a confession for jurors to consider in determining the weight or probative value given the statement." "This limited purpose stands in contrast to introducing such evidence on the issue of guilt or innocence." *See generally*, La. C.Cr.P. art. 651 ("When a defendant is tried upon a plea of 'not guilty,' evidence of insanity or mental defect at the time of the offense shall not be admissible.")

The Louisiana Supreme Court has noted that diminished mental or intellectual capacity does not itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. *State v. Benoit*, 440 So.2d 129, 131 (La. 1983). Thus, low intellect, moderate mental retardation, or diminished mental capacity does not per se and invariably vitiate capacity to make a knowing and intelligent *Miranda* waiver. *State v. Manning*, 03-1982 (La. 10/19/04); 885 So.2d 1044, 1074, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). In cases involving allegations of diminished mental capacity, a defendant has the burden of proving the existence of any mental abnormality that might render his confession per se involuntary. A diminished intellectual capacity does not alone vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. *State v. Pugh*, 02-171 (La. App. 5 Cir. 10/16/02); 831 So.2d 341, 352-53.

In *State v. Chester*, 15-2304 (La. 12/16/16); 208 So.3d 338, after his conviction for first degree murder and sentence of death on direct appeal was affirmed, Defendant filed an application for post-conviction relief arguing that his counsel erred in litigating the motion to suppress his custodial statements because she failed to show the statements were not made pursuant to a valid waiver. Defendant argued that he was a scared-eighteen-year-old with intellectual disabilities—circumstances which should have prompted counsel to argue that he could not have understood his rights well enough to knowingly and intelligently waive them.

The Louisiana Supreme Court found that because Defendant expressly waived his rights, the question was whether his waiver was knowing and intelligent under the totality of the circumstances, including his "background,

experience, and conduct," and that his alleged diminished capacity was but one

factor to consider. The supreme court further found:

> His assertion that it was nevertheless invalid because of his youth and low intellect, as evinced by his reading and language comprehension deficits, without more, is insufficient to vitiate his waiver. *See State v. Brown*, 414 So.2d 689, 696 (La. 1982). ("[M]oderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.") (citations and internal quotes omitted); *see also State v. Holmes*, 06-2988, pp. 20-21, 43 (La. 12/2/08), 5 So.3d 42, 59-60, 72-73 (defendant with IQ of 77 and fetal alcohol syndrome made knowing and intelligent waiver); *Green*, 94-0887, pp. 7-19, 655 So.2d at 278-84[5] (mildly retarded defendant's waiver was knowing and intelligent, despite psychologist's testimony that he was unable to comprehend his rights, because psychologist also testified he was educable and could be made to understand, and officers testified he understood, at least partially because of his criminal history); *compare State v. Istre*, 407 So.2d 1183, 1186-87 (La. 1981) (19-year-old with IQ of 68 who did not know his own age intelligently waived his rights, which were explained in simplistic terms); and *State v. Anderson*, 379 So.2d 735, 736 (La. 1980) (fact that defendant was an illiterate, unemployed 17-year-old with the mental age of 8 and an IQ between 50 and 69, coupled with ambivalent police testimony about whether he understood the rights, supported conclusion he was incapable of executing a valid waiver).
>
> Under the circumstances, we find that the state would have carried its burden of proving that Chester's waiver was knowing and intelligent, had trial counsel attacked the statements' admissibility on these grounds. Thus, Chester cannot show that his motion to suppress would have been granted but for trial counsel's omission. *See generally Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (petitioner must show the overlooked motion would have been meritorious and a reasonable probability of a different verdict absent the alleged error) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). [Footnote added].

*Id.* at 344-45. We find that, although Defendant stated that he had a limited

education and could not read very well, he did not prove the existence of any

---

[5] *State v. Green*, 94-887 (La. 5/22/95); 655 So.2d 272.

mental abnormality that might render his confession per se involuntary.[6]

Defendant further complains that his pre-interviews were not recorded. He made this same complaint in his motion to suppress statements, and it was also raised in Defendant's previous appeal. In *State v. Flowers*, 16-130 (La. App. 1 Cir. 9/19/16); 204 So.3d 271, *writ denied*, 16-1871 (La. 9/6/17); 224 So.3d 983, the defendant argued that the trial court erred in denying his motion to suppress his statement. He complained that only eight minutes of a three-and-one-half-hour interview were recorded. According to the defendant, he was denied his rights under La. R.S. 15:450[7] because a portion of the interview was not recorded and the hours that the defendant was alone in the room with the detective likely would offer some explanation as to what led the defendant to make the statement. The appellate court found that the defendant's confession was properly admitted in compliance with La. R.S. 15:450. It further found that, despite the fact that not all of the defendant's conversation with the detective was taped, the entire tape recording of the confession was played before the jury at the defendant's trial, and the detective explained what was discussed during the remainder of the conversation. The appellate court noted that according to the detective, prior to the recorded statement, he explained the allegations and

---

[6] Additionally, the record reflects that on November 12-15, 2013, the trial court held an extensive hearing regarding Defendant's claim of mental retardation pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), prior to the granting of federal habeas corpus relief (on different grounds). In *Atkins v. Virginia*, the Supreme Court held that the execution of mentally retarded persons (now referred to as intellectually disabled persons) constitutes excessive punishment and therefore violates the Eighth Amendment. Although the contents of the *Atkins* hearing and the ruling were not admitted into evidence at the suppression hearing or at trial in the instant case, it is noted that the same judge who presided over that hearing presided over the trial in the instant case. In a written judgment dated December 5, 2013, the trial court stated that Defendant had an average IQ, and the judge denied Defendant's claim, stating in pertinent part:

> In summary, Petitioner fails to meet his burden of proving he is mentally retarded by preponderance of evidence. Petitioner did not submit sufficient evidence to meet this burden. Moreover, the State presented ample evidence that Petitioner is not mentally retarded. The court has had the opportunity to observe Petitioner in court on several occasions, and is impressed with petitioner's intellectual abilities to discuss complicated legal issues with an obvious degree of understanding. Petitioner has also filed numerous pleadings and has a strong grasp of the law in areas at issue.

[7] La. R.S. 15:450 provides:

> Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.

charges to the defendant. *Id.* at 278-80; *State v. Chism*, 08-474 (La. App. 5 Cir. 12/16/08); 3 So.3d 41, *writ denied*, 09-153 (La. 10/2/09); 18 So.3d 102.

In *State v. Thibodeaux*, 98-1673 (La. 9/8/99); 750 So.2d 916, *cert. denied*, 529 U.S. 1112, 120 S.Ct. 1969 (2000), the defendant maintained that his due process rights were violated because the officer talked to him while the tape recorder was turned off. The Louisiana Supreme Court held:

> [T]here is no due process requirement that a statement given to the police must be recorded. Nor is there any support in the record for the Defendant's claim that a portion of his statement was unrecorded somehow violated his due process rights or coerced him into giving a confession. The law does not require the production of non-existent portions of the confession or portions which cannot be recalled. *State v. Marmillion*, 339 So.2d 788, 793 (La. 1976). In the absence of proof to the contrary, the fact that the purported statement of the accused as testified to by the investigating officer does not consist of a verbatim reiteration of the conversation between them due to the witness's inability to recall or other valid explanation does not violate the rights of the accused. *State v. Lefevre*, 419 So.2d 862, 867 (La.1982).

*Id.* at 923-24.

Even though there were unrecorded pre-interviews, we find Defendant's custodial statements were properly admitted in compliance with La. R.S. 15:450. As in *Flowers*, the record in the instant case reflects that both of Defendant's custodial statements were played before the jury in their entirety and that Lt. Sacks explained what was discussed during the remainder of the conversation. Also, as in *Chism*, we find that the jurors in the instant case were made aware of the circumstances under which Defendant made the incriminating statements to the lieutenant (then detective) and that the jury had an adequate basis for deciding the credibility issue against Defendant. Further, the law does not require the production of non-existent portions of the confession or portions which cannot be recalled. *See Thibodeaux, supra.*

Next, Defendant argues that the statements should have been suppressed because he was detained and questioned for a long period of time. Defendant said

that he was detained and/or questioned for approximately six hours. Lt. Sacks testified that Defendant was brought to the detective bureau at 11:00 a.m. The rights of arrestee form is dated March 18, 1996, at 1536 hours (3:36 p.m.). The record reflects that Defendant's first statement was taken at 4:22 p.m., and his second statement was taken at 5:11 p.m. and concluded at 5:34 p.m.

In *State v. Green*, 19-123 (La. App. 5 Cir. 12/26/19); 286 So.3d 1230, this Court found that the length of the interview did not render the defendant's statement involuntary. This Court recognized that "[a]lthough the statement was approximately twelve and one-half hours long, the length of the interview was not attributable to coercion, but rather, it was precipitated by the defendant's deception in denying his involvement in the homicides for many hours." *Id.* at. 1240. This Court further found that with respect to the conditions surrounding the statement, the videotaped statement reflected that the defendant was allowed to use the restroom and was given something to eat and drink. This Court noted that the video also showed that the defendant rested and slept alone for periods of time in the chair he was sitting in during the twelve-and-one-half-hour period. *See also State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03); 858 So.2d 80, *writs denied*, 03-2745 (La. 2/13/04); 867 So.2d 688 and 08-1951 (La. 1/30/09); 999 So.2d 750; *State v. Blank*, 04-204 (La. 4/11/07); 955 So.2d 90, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).

In the instant case, Defendant was at the detective bureau from 11:00 a.m. until approximately 5:30 p.m. During that time, there were two pre-interviews and two recorded statements. Although Defendant was detained approximately six and one-half hours, he was not questioned the entire time. This Court finds, as we did in *Green* and *Bradley*, that the length of the interview was not attributable to coercion, but rather, it was precipitated by Defendant's deception in his initial

statement. Also, we note that Defendant was given something to drink and allowed to use the bathroom facilities as needed. Defendant also argued that there was no proof that in the lengthy time periods during which the tape recorder was intentionally turned off, no law enforcement officer exerted any coercion, intimidation, or undue influence on him. However, Lt. Sacks testified that none of the JPSO investigators in the homicide division applied any force or coercion to Defendant for him to make a statement. Further, he knowingly and voluntarily waived his rights and never invoked his right to remain silent while speaking to Lt. Sacks. Therefore, we find that the trial court did not err in denying the motion to suppress on this ground.

Defendant additionally contends that his statement at the time his blood was drawn should have been suppressed. Lt. Sacks recalled that he went to the correctional facility and met with Defendant in the medical pod to advise Defendant that he had a search warrant to obtain blood from him. He testified that Defendant then said, "I already told you it was the cab driver's blood." Lt. Sacks said that he did not ask Defendant any questions. Lt. Sacks recalled that Defendant was uncooperative and had to be held down on a gurney by three deputies so medical personnel could procure the sample. He did not believe Defendant was handcuffed at the time. He further testified that he did not re-advise Defendant of his *Miranda* rights. Lt. Sacks stated that he did not force, threaten, or coerce Defendant into making that statement at the time his blood was drawn.

The obligation to provide *Miranda* warnings attaches when a person is questioned by law enforcement after he has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *State v. Payne,* 01-3196 (La. 12/4/02); 833 So.2d 927, 934. As such, *Miranda* warnings are applicable only when it is established that the

defendant has been subject to a "custodial interrogation." Interrogation under *Miranda* refers not only to express questioning but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Payne*, 833 So.2d at 938.

Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible without *Miranda* warnings even where a defendant is in custody. *State v. Castillo*, 389 So.2d 1307, 1310 (La. 1980), *cert. denied*, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981). Police officers are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as the statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response." *State v. Ross*, 95-1798 (La. 3/8/96); 669 So.2d 384, 386. Even if a suspect is in custody, one's spontaneous statements need not be suppressed because they are not the product of custodial interrogation. *See State v. Smith*, 00-1838 (La. 5/25/01); 785 So.2d 815, 817.

In the instant case, the record reflects that Lt. Sacks informed Defendant of his intention to draw blood pursuant to the warrant, after which Defendant made a spontaneous statement to Lt. Sacks that the blood on the cap was the cab driver's blood. We find that Defendant's spontaneous statement to Lt. Sacks was not made in response to questioning, and therefore, it need not be suppressed.

Based on the foregoing, we find that the trial court did not abuse its discretion by denying Defendant's motion to suppress his statements.

*ASSIGNMENT OF ERROR NUMBER THREE*

The trial court erred in allowing the State to admit fifty-two pages of incomplete letters.

*DISCUSSION*

Defendant argues that the trial court erred by allowing the State to admit fifty-two pages of incomplete and confusing letters that he allegedly wrote to his girlfriend, Quinice Pollard. He further argues that the letters were more prejudicial than probative and should have been excluded. Defendant contends that the letters were the product of an immature and cognitively-disabled teenager struggling to do what he could to help his case. He also contends that the letters painted a one-sided version of their communication. Defendant asserts that he never told Ms. Pollard to lie but instead to "help him out." He maintains that the context of the letters is unclear and impossible to clarify given the passage of time and his right not to testify.

The State responds that the trial court did not err by admitting letters Defendant wrote to Ms. Pollard. It further responds that it introduced the letters to show Defendant's threats toward Ms. Pollard and his attempts to get her to not cooperate with the prosecution. The State maintains that it was not attempting to "cherry pick" parts of the letters and that it introduced all of the letters in its possession subject to agreed-upon redactions. It argues that ruling the letters inadmissible due to missing pages that could not be located would lead to absurd and inequitable results as the Louisiana Supreme Court "likely recognized" in *State v. Marmillion*, 339 So.2d 788 (La. 1976).

The State asserts that probative evidence should not be rendered inadmissible due to limited portions of evidence being unavailable through no fault of the State or of Defendant. It further asserts that Defendant was free to explore the incomplete nature of the letters and to posit his own interpretation of the content of the letters to the jury. The State contends that while Defendant claimed the incomplete letters only showed that he was a dangerous ex-boyfriend

who threatened to kill Ms. Pollard, the defense, during cross-examination of Ms. Pollard, highlighted for the jury the parts of the letters where Defendant demonstrated care toward Ms. Pollard and her daughter. The State argues that under the circumstances, there is no violation of La. R.S. 15:450, which requires that every declaration must be used in its entirety.

On August 31, 2018, the State filed State's Notice of Intent to Use Other Acts Evidence Pursuant to La. C.E. Article 404(B). In that notice, the State sought to introduce evidence of other acts at trial, namely, multiple letters Defendant wrote to his girlfriend, Quinice Pollard, while he was incarcerated. In the letters, Defendant threatened to kill Ms. Pollard if she left him for another man and told her to change her statement, testify that she did not remember what Defendant told her, or if she saw him with the gun, and to tell her sister and the other witnesses to help by not coming to court. The State indicated that the letters written to Quinice to attempt to dissuade her from testifying about his confessions were highly probative and relevant to prove identity, opportunity, plan, intent, guilty knowledge, and absence of mistake or accident.

On September 7, 2018, at the hearing on the motion, the trial judge denied the motion in limine to exclude the evidence, explaining that she was allowing the letters in their entirety. The court also asked counsel to try to come to a consensus on redacting portions of the letters.

Defendant filed a writ application challenging the trial judge's ruling. On September 14, 2018, this Court denied the writ application, stating in pertinent part:

> In its motion filed pursuant to La. C.E. art. 404(B), the State first requested leave to introduce letters relator wrote to his girlfriend, Quinice Pollard, and her sister, Kaprice Pollard, which include threats and attempts to influence their testimony against him. The State notes that in his statement, relator claimed Elbert Ratcliff shot the victim and relator further claimed he was unaware of the armed robbery committed by Ratcliff and was just trying to sell fake drugs to the

victim. The State notes that Quinice Pollard and her sister, Kaprice, will testify that relator confessed to participating in the armed robbery and murder. The State argues that relator's threats and attempts to influence their testimony is relevant to negating relator's defense and establishing his guilty knowledge and intent to commit the murder.

Other crimes evidence may be used to prove knowledge when proof of such knowledge is required to establish guilt. *State v.Silguero*, 608 So.2d 627, 629 (La. 1992); *State v. Leday*, 11-1022 c/w 12-54 (La. App. 5 Cir. 6/28/12), 97 So.3d 501, 505, *writ denied*, 12- 1765 (La. 3/1/13) 108 So.3d 788. Guilty knowledge is used to negate an innocent explanation for an undoubtedly unlawful act, as possibly done unknowingly. *Id.*

We find the trial court did not abuse its discretion in granting the State's motion to introduce relator's jailhouse letters. We agree with the State's position that the letters contain relevant evidence to establish guilty knowledge and further agree the probative value of these letters outweighs any potential prejudice. We further note that at the hearing on this motion, the State offered to redact irrelevant portions of the letters if relator does not want to introduce the letters in their entirety.

*See State v. Chester*, 18-K-525 (La. App. 5 Cir. 9/14/18) (unpublished writ disposition).

On September 17, 2018, defense counsel moved to exclude any of the letters that were incomplete. The prosecutor responded that the trial court had already ruled that all of the letters were admissible. Later that day, Defendant filed a Motion in Limine to Exclude Incomplete Statements Attributed to the Defendant. In that motion, Defendant acknowledged the existing order allowing the letters to be admitted but argued that they should not be admitted because the letters were missing pages and La. R.S. 15:450 prohibited the introduction of incomplete confessions, admissions, or declarations. Defendant contended that introduction of these letters in their current form would cause a material injustice at trial as statements attributed to him would be presented to the jury without a full understanding of the context and circumstances surrounding the statements.

On September 19, 2018, at the hearing on the motion, the prosecutor responded that the issue was moot, noting that he had attached all of the letters to

his 404(B) motion, the objection was not raised timely, and the trial court and this Court had already found those letters to be admissible. After hearing arguments of counsel, the trial judge denied the motion to exclude the letters, stating in pertinent part:

> With respect to - - with respect to the statements, I mean, I'm sorry, the letters, there's been - - there's a mo - - there's been a motion to exclude the letters on the grounds of lack of completeness. And I think it's 15:450 if I'm not mistaken is the statute that applies. What has been produced and what is going - - what is intended to be offered is all that is available to the State. The State's not attempting to cherry-pick parts and not present others. I believe that the intent of 15:450 is satisfied here, and I am denying the request to exclude the letters.

Defendant filed a writ application challenging the trial court's ruling.

This Court denied the writ, stating in pertinent part:

> A motion *in limine* presents an evidentiary matter that is subject to the great discretion of the trial court. *State v. Calderon*, 16-690 (La. App. 5 Cir. 4/12/17); 220 So.3d 830, 837. An appellate court will not disturb the trial court's rulings on the State's motions *in limine* absent an abuse of discretion. *Id.*
>
> On the showing made, we do not find the trial court erred in denying Relator's motion. We note that Relator has an adequate remedy on appeal in the event of a conviction. Accordingly, the writ application is denied.

*See State v. Chester*, 18-K-542 (La. App. 5 Cir. 9/20/18) (unpublished writ disposition)

Ultimately, the trial court admitted Defendant's letters to Ms. Pollard for record purposes only and without redactions, as well as Ms. Pollard's letters to Defendant, which the defense asserted showed that Ms. Pollard was not afraid of Defendant and the two enjoyed a close, loving relationship at some point.

Under the doctrine of "law of the case," an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. *State v. Falcon*, 13-849 (La. App. 5 Cir. 3/12/14); 138 So.3d 79, 87-88, *writ denied*, 14-769 (La. 11/14/14); 152 So.3d 877. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the

determination was patently erroneous and produced unjust results. *Id.* We find that there is no additional evidence in the subsequent trial record that would suggest that this Court's prior determination on this issue was patently erroneous or produced unjust results and decline to reconsider this Court's previous rulings regarding the motion to exclude the letters.

## ASSIGNMENT OF ERROR NUMBER FOUR

The trial court erred in failing to conduct a *Daubert* hearing for the 1996 DNA testing.

## ASSIGNMENT OF ERROR NUMBER FIVE

The trial court erred in admitting unreliable and prejudicial DNA evidence.

## DISCUSSION[8]

Defendant argues that the trial court erred by failing to conduct a *Daubert*[9] hearing for the 1996 testing; however, he failed to brief that assignment of error. All specifications or assignments of error made to the courts of appeal must be briefed; the court may consider as abandoned any specification or assignment of error which has not been briefed. Uniform Rules – Courts of Appeal, Rule 2-12.4; *State v. Camp*, 16-473 (La. App. 5 Cir. 3/15/17); 215 So.3d 969, 973. Because Defendant has failed to brief this assignment, we will consider it waived and pretermit further discussion of the issue.

Defendant also argues that the trial court erred by admitting unreliable and prejudicial DNA evidence. He contends that the introduction of DNA evidence which connected the victim to a blood spot found on a cap seized from his brother's house had such a low statistical probability of being Mr. Adams' blood that it unfairly prejudiced him at trial. He further argues that the statistical

---

[8] The assignments of error are discussed together because they are related, and Defendant addresses them together in his brief.

[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

probability of a match was so low as to be more prejudicial than probative. He also contends that the State relied on the statistic of one in 339 Caucasian men and women matching the profile of the blood found on the cap to support its position that Defendant was inside of the cab during the shooting. Defendant also asserts that the prosecutor overstated the probative value of the test results during closing arguments. He argues that because the DNA testing did not produce relevant results and confused the jury into believing that it proved more than it did, this Court must grant him a new trial.

The State responds that the trial court did not abuse its discretion by admitting this DNA evidence. It further responds that Defendant's protestations relative to the probative value of the DNA evidence properly go to the weight of the evidence rather than its admissibility. The State argues that the mere fact that the statistical probabilities from tests performed in 1996 are not as discriminating as the statistical probabilities from tests performed with modern technology does not make the scientific methodology "unreliable" in any way. It also argues that the scientific methodology is reliable because the statistical probabilities can be trusted to be what they purport to be, and it is properly the function of the jury to decide what weight, if any, to accord to those statistical probabilities. The State asserts that Defendant extensively cross-examined the State's witnesses as to the statistical probabilities at issue and presented to the jury Defendant's account of why the jury should place no weight on the DNA evidence.

In the instant case, the State also argues that under the law of the case doctrine, this Court need not revisit this issue because nothing has changed from the trial court's first ruling prior to the first trial. On April 23, 1997, prior to Defendant's first trial, a hearing was held on Defendant's motion for admissibility of DNA testing. At that hearing, Anne Montgomery testified, and the trial judge, not the same judge as in the instant case, allowed the DNA evidence to be

admitted at trial. Under the doctrine of law of the case, an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. *Falcon*, *supra*.

In *State v. Langley*, 10-969 (La. App. 3 Cir. 4/6/11); 61 So.3d 747, 765-67, *writ denied*, 11-1226 (La. 1/20/12); 78 So.3d 139, *cert. denied*, 568 U.S. 841, 133 S.Ct. 148, 184 L.Ed.2d 73 (2012), the third circuit stated that a review of the jurisprudence had found no case in which the law of the case doctrine had been applied to a trial judge's rulings on issues that were ruled upon by an earlier trial judge in a prior trial of the same case. The third circuit found that the law of the case doctrine was not applicable to the case before it because the trial at issue was not a later stage of the prior trials. Although the doctrine manifests the appellate court's general practice not to re-litigate decided matters, the doctrine is not a limit on judicial authority. *See id.* Therefore, in this case, because this new trial is not a later stage of the prior trial, we find that the law of the case doctrine is not applicable in this instance.

On August 31, 2018, Defendant filed a Motion to Exclude DNA Evidence Where Statistical Probability of a Match is So Low as to be More Prejudicial than Probative. In that motion, Defendant moved to exclude the DNA evidence on the cap and asked for a *Daubert* hearing. At the hearing on the motion, defense counsel argued that the prior DNA testing done in 1996 on the cap should be excluded because it was more prejudicial than probative and because the statistics were so common as to not have any relevance to whether Defendant was wearing that cap on the night the victim was killed. The prosecutor responded that the nature of the probability did not make the evidence irrelevant. Rather, he contended that it went to the weight of the evidence and that the jury could determine how much weight, if any, to give it. After hearing arguments of counsel, the trial court denied the motion, finding that the evidence was relevant

and that defense counsel could make their arguments about the weight it deserved. Defense counsel noted her objection to the trial court's ruling.

At trial, Anne Montgomery, qualified as an expert in the fields of molecular biology and DNA analysis, testified that she conducted DNA testing in the instant case in 1996 on the baseball cap and that neither the victim nor the Defendant could be excluded as DNA donors. Ms. Montgomery noted that she looked at two genetic markers to generate population frequencies, and she explained that approximately one in 339 Caucasian individuals would have those two genetic markers in their profile if she looked at random Caucasian individuals.

Ms. Montgomery testified that between 1996 and 2018, DNA science had evolved and expanded. When Ms. Montgomery was contacted about the instant case, she recommended re-testing the evidence using "today's markers" – the standard at the present time is fifteen to twenty-two markers for a composite profile, versus only two markers in 1996. The increased numbers of markers make DNA tests more sensitive and the analysis results more discriminating, Ms. Montgomery explained. The Jefferson Parish Crime Lab re-tested samples from the jeans and baseball cap in evidence. The crime lab was unable to generate a profile due to either the inadequate sample size or degradation of the evidence after twenty-plus years; however, that did not invalidate or negate her 1996 results. Ms. Montgomery also testified that there was nothing in the way DNA testing was done in 2018 that would cause her to have any doubt in the accuracy of the results she obtained in 1996. Nevertheless, she testified that the methods she used to conduct DNA analysis in 1996 were considered to be state of the art at the time and that the improved testing methods do not render the 1996 test results unreliable or invalid.

Ms. Schneida testified that she was the JPSO DNA Director and the trial

court qualified her as an expert in the field of forensic DNA analysis. Ms. Schneida testified that she conducted further testing in August of 2018 on the Raiders baseball cap for possible blood, but the results were negative. She acknowledged that there was a positive result for blood on the baseball cap previously but explained that either the sample was consumed or it degraded over time. She did not know how the evidence was stored but noted that extreme heat, exposure to humidity or moisture, or light could degrade DNA. Ms. Schneida also felt that the inability to redo DNA testing, due to the lack of forensic material available for testing, did not invalidate the prior positive result.

As a general matter, under La. C.E. art. 702, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise." *State v. Mosley*, 08-1318 (La. App. 5 Cir. 5/12/09); 13 So.3d 705, 714, *writ denied*, 09-1316 (La. 03/5/10); 28 So.30.d 1002; *State v. Higgins*, 03-1980 (La.4/1/05); 898 So.2d 1219, 1239, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

The decision whether to reject or accept the person as an expert falls to the great discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion. *State v. Craig*, 95-2499 (La. 5/20/97); 699 So.2d 865, 870, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).

With regard to the relevance of DNA testing, La. R.S. 15:441.1 provides that "[e]vidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence." In *State v. Ledet*, 00-1103 (La. App. 5 Cir. 7/30/01); 792 So.2d 160, 173, *writ denied*, 01-2451 (La. 9/30/02); 825 So.2d 1185, this Court found that it

was clear from La. R.S. 15:441.1 that the Louisiana Legislature intended DNA evidence to be admissible absent a showing that the evidence was unreliable. This Court acknowledged that Louisiana courts had recognized that DNA "typing" was sufficiently scientifically reliable to cross the admissibility threshold and that both federal and other state courts had found, in general, that DNA profiling is a reliable technique and is admissible. It noted that both federal and other state courts had found that, in general, DNA profiling was a reliable technique and was admissible.

La. R.S. 15:441.1 provides that DNA evidence is relevant to establish identity. *See Ledet, supra*. Further, defense counsel extensively cross-examined Ms. Montgomery regarding the DNA evidence, eliciting testimony that the statistical probabilities in 1996 were not as discriminating as those of today. Additionally, it was the function of the jury to determine what weight, if any, to give the DNA evidence. A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-154 (La. 11/27/95); 663 So.2d 27, 35. Accordingly, we find that the trial court did not abuse its discretion by denying the motion to exclude the DNA testing in this case. The evidence and testimony given at trial regarding the DNA test results show that at least two people's blood were on the cap, and Defendant and the victim could not be excluded as donors. We further find that the trial court did not err in admitting the DNA evidence as it was cumulative of Defendant's statements to the police where he placed himself in the cab at the time of the shooting and his statement to Lt. Sacks that the blood on the cap was the victim's blood.[10]

---

[10] *Compare State v. Williams*, 17-0312 (La. App. 4 Cir. 12/20/17); 234 So.3d 1040, 1054, "Even if the trial court erred in admitting the evidence regarding the preliminary gunshot residue test, we find that the error was harmless. This Court has recognized that '[w]here improperly admitted evidence is merely corroborative and cumulative of other properly introduced evidence, it is considered harmless error.'"

*ASSIGNMENT OF ERROR NUMBER SIX*

The trial court erred in excluding expert testimony on Mr. Chester's vulnerability and false confession.

*DISCUSSION*

Defendant argues that the trial court abused its discretion by excluding expert testimony on his vulnerability, mental capacity, and false confession that violated his Sixth Amendment right to present a defense. He contends that the trial court accepted Dr. Gregory DeClue as an expert in forensic psychology but erroneously failed to recognize him as an expert in police psychology as it related to false confessions. Defendant argues that although he did not confess to a crime he did not commit, he did make false statements due to his diminished mental capacity. He asserts that his defense was that there was no reliable forensic evidence that linked him to the crime and that his false statements regarding being inside of the cab at the time of the shooting, wearing a Raiders cap, having blood on his clothes and hat, and that the blood belonged to the cab driver should not be believed. Defendant argues that this error requires reversal.

The State responds that the trial court did not abuse its discretion by excluding Dr. DeClue's testimony. It contends that while a defendant has a constitutional right to present a defense, constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, but rather, only that which is deemed trustworthy and has probative value. The State points out that the law is unsettled, and the jurisprudence is split as to whether expert testimony on false confessions should be admissible in a criminal trial. It submits that expert testimony on false confessions is not even relevant in the instant case given that Defendant did not confess to the police; rather, it explains that Defendant gave statements which, while placing him on the scene, were essentially inculpatory, with the Defendant claiming that he was in the wrong

place at the wrong time.

In any event, the State contends that even if the testimony could have some marginal relevance, the trial court did not abuse its broad discretion in excluding it. The State argues that Dr. DeClue, who never met or tested Defendant, never met the detectives, never analyzed the interrogation techniques, and never reviewed important information, would have little to offer the jury except for the abstract conclusions that false confessions can occur, that an individual of limited intelligence could potentially be vulnerable to police pressure, and that "contaminating" an interrogation such as by feeding a suspect information could potentially taint the results. The State further contends that all of these abstract conclusions were within the understanding of average jurors and that having Dr. DeClue testify to these conclusions would only invade the province of the jury and waste time by telling the jury what it already could be expected to know. The State further submits that there is not a sufficient showing of scientific reliability, either in this case, or as to this "science" in general, to justify admissibility.

On August 31, 2018, Defendant filed Motion to Admit Expert Testimony on False Confessions. In that motion, Defendant stated that he wished to call Dr. Gregory DeClue as an expert witness to explain the existence of false confessions, the factors that create vulnerability in individuals to falsely confess, and the situational factors in interrogations or other circumstances that can lead to false confessions, in order to educate and assist the jury in assessing the weight to be given to the evidence of confessions the State intended to present. Defendant also stated that he intended to call Dr. DeClue regarding the reliability of the interrogation process and not the truthfulness of witnesses. He asserted that Dr. DeClue's testimony would be relevant to the voluntariness of Defendant's statements and that he did not intend for Dr. DeClue to give an ultimate conclusion or opinion as to whether the confessional statements made were false.

On September 6, 2018, the State filed State's Motion in Limine and Opposition with Incorporated Memorandum to Exclude Expert Testimony on False Confessions. In its opposition, the State submitted that the law suggested that there was support both for and against the admissibility of expert testimony on false confessions. The State argued that the majority of the cases had permitted expert testimony on false confessions where there was evidence that Defendant suffered from a mental disorder that caused him to make such inculpatory statements. It further argued that the instant case is distinguishable because Defendant does not assert any claim that such statements were made pursuant to a mental disorder that caused the Defendant to make such statements. The State contended that there had been no showing made that: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. The State also contended that the testimony Defendant wished to elicit from Dr. DeClue was not relevant, it did not assist the trier of fact, and what, if any, probative value it had was substantially outweighed by the danger of undue prejudice, confusion of the issues, and was misleading to the jury. The State maintained that Defendant never claimed that he gave a false confession prior to the filing of the motion to admit expert testimony and that his motion to suppress statements was devoid of such a claim.

On September 7, 2018, at the hearing on the motion, the trial court decided that a *Daubert* hearing was necessary. She also ordered defense counsel to provide a report to the State.

On September 17, 2018, the State filed State's Supplemental Motion in Limine and Opposition with Incorporated Memorandum to Exclude Expert

Testimony. In its supplemental opposition, the State argued that the expert's testimony should also be excluded because Defendant failed to comply with the discovery articles. The State pointed out that despite assurances in court from defense counsel that a report would be provided by September 12, 2018, it had not received any expert report from this proposed expert or any written list of materials upon which his conclusion was based and the opinion and reason as required by La. C.Cr.P. art. 725.

On September 19, 2018, a *Daubert* hearing was held. At that hearing, the trial court admitted Defense Exhibit D3, in globo—twelve documents relied upon by Dr. DeClue—into evidence for purposes of the hearing. Dr. DeClue testified that he was a forensic psychologist. After listening to Dr. DeClue's educational and employment background, the trial court accepted him as an expert in the field of forensic psychology but not in police psychology.

Dr. DeClue further testified that suspects and witnesses sometimes make false confessions. He stated that there had been controlled studies of false confessions that were subject to peer review. He asserted that an interview could be "contaminated" if the police tell details of the crime to the media, witnesses, or suspects because it could make it difficult to know whether details in the suspect's statement came from actual knowledge.

Dr. DeClue testified that best practices for police interrogation had been developed, which were to record the entire interaction, to investigate before you interrogate, to hold back details that would likely be known by the person who committed the crime, and to use non-leading questions. Dr. DeClue testified that there were best practices with respect to special precautions that should be taken with juveniles, mentally impaired people, and people who were deemed vulnerable. He explained that some police deliberately mislead or lie or inadvertently say something that is false during an interrogation and that those

people with limited cognitive ability and other vulnerable populations are considered to be more at risk to succumb to that type of pressure and come to believe in that moment that they would be better off by saying that they committed the crime even if they did not.

Dr. DeClue stated that he had reviewed materials from the instant case which included Defendant's statements, police records, school records, psychological reports, SSI materials, and witness statements. He learned that Defendant only completed the seventh grade and had to repeat first, second, and third grades. Dr. DeClue maintained that up until the time of his questioning by the police, the records were clear that he had difficulty learning and that he was classified as mentally retarded as a child and received disability benefits for that. He noted that Defendant's IQ testing had been inconsistent and that he had trouble reading and writing. Therefore, Dr. DeClue concluded that Defendant could have been a vulnerable person when he was questioned by the police in the instant case.  Dr. DeClue noted that he had never met Defendant or administered any tests to him. He said that it was still possible that he might meet with Defendant and conduct tests on him.  He opined that the statements of Quinice and Kaprice Pollard contained examples of contamination and psychological coercion, which could contribute to a false statement. Dr. DeClue also stated that he did not meet with the detectives, that he did not know about the detectives' experience and training, and that he did not review the *Atkins* hearing.

Following Dr. DeClue's testimony, defense counsel and the State argued their respective positions. The trial court then denied the motion to allow Dr. DeClue to testify, stating in pertinent part:

> Okay. I don't even think it's a close question here. Dr. DeClue never met Mr. Chester. He never evaluated whether Mr. Chester gave a false confession, nor did he analyze the interrogation techniques used. He would ask the jury to apply

science and abstract with only remote if any connection between the testimony and the facts of this case.

I don't think he has anything more than abstract scientific notions, and he does not recognize - - apply recognized acceptable principles to Mr. Chester's particular circumstances. He offers only that false confessions can occur.

I think that the testimony is not helpful and does invade the province of the jury. And I do think that probative value if any is substantially outweighed by the danger of misleading the jury and jury confusion. So there would be prejudice.

I think the jury's capable of using its common sense and common knowledge to determine the reliability of the Defendant's statement, is capable of understanding the reasons it may be unreliable without the assistance of Dr. DeClue's opinions.

Again, he never met with Mr. Chester. He's going to make a determination or base his opinion on vulnerability of Mr. Chester on Mr. Chester's early school records and an SSI determination of retardation. I find his information is incomplete and conclusions are not reliable. And in fact, he admits no factual basis for him to reach conclusions to a reasonable degree of certainty, and yet he's - - he doesn't shy away from doing so despite those admissions.

Also he wants to be able to get in - - He said the two purposes were to get in the information about the SSI and the early school struggles and to have - - tell the jury about the dangers of contamination. I just - - I just don't think that this is going to be helpful to the jury at all.

Also I have to say I did find the doctor's responses to questioning to be largely evasive, and I thought - - I felt that he was intentionally obtuse at times.

And for all those reasons I am not allowing his testimony.

Defense counsel objected to the trial court's ruling.

As a general matter, under La. C.E. art. 702, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise." *See Mosley, supra*. Notably, the supreme court has placed

limitations on this codal provision in that "[e]xpert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men." *State v. Stucke*, 419 So.2d 939, 945 (La. 1982). *See also State v. Young*, 09-1177 (La. 4/5/10); 35 So.3d 1042, 1046-47, *cert. denied*, 562 U.S.1044, 131 S.Ct. 597, 178 L.Ed.2d 434 (2010). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. La. C.E. art. 403. The decision whether to reject or accept the person as an expert falls to the great discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion. *See Craig, supra.*

In *Foret*, *supra*, the Louisiana Supreme Court adopted the test set forth in *Daubert*, *supra*, regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *See Chauvin*, *supra.*

In *State v. Lamonica*, 09-1366 (La. App. 1 Cir. 7/29/10); 44 So.3d 895, 900- 07, *writ denied*, 10-2135 (La. 2/18/11); 57 So.3d 331, the defendant argued that his expert witness should have been allowed to testify at trial about false confessions and the influence of "high-control" groups or cults. The first circuit found no reason to disturb the trial court's ruling. Although the facts in *Lamonica* are different from those in the instant case, the first circuit discussed the law in general regarding false confessions. The first circuit stated that there was little case law in Louisiana on false confessions in a police interrogation setting. It further stated that the law in other jurisdictions suggested that there was support both for and against the admissibility of expert testimony on false confessions. The appellate court noted that various courts had found it inappropriate to admit this testimony, citing *United States v. Griffin*, 50 M.J. 278, 285 (U.S.A.F. 1999);

*State v. Cobb*, 30 Kan. App. 2d 544, 43 P.3d 855, 869 (2002); *State v. Tellier*, 526 A.2d 941, 944 (Me. 1987); *State v. Davis*, 32 S.W.3d 603, 608-09 (Mo. App. 2000); *State v. Free*, 351 N.J.Super. 203, 798 A.2d 83, 95-96 (2002); *Green v. State*, 55 S.W.3d 633, 640 (Tex. App. 2001), *cert. denied*, 535 U.S. 958, 122 S.Ct. 1366, 152 L.Ed.2d 360 (2002); and *Vent v. State*, 67 P.3d 661, 669 n. 37 (Alaska App. 2003). The first circuit in *Lamonica* also noted that other courts had permitted expert testimony on false confessions, citing *United States v. Shay*, 57 F.3d 126, 132-34 (1st Cir. 1995); *Callis v. State*, 684 N.E.2d 233, 239 (Ind. App. 1997); *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65, 72-74 (1998); *State v. Baldwin*, 125 N.C.App. 530, 482 S.E.2d 1, 5 (1997); and *Vent*, 67 P.3d at 669 n.36. It asserted that, of the aforementioned cases, cases that had upheld the admissibility of expert testimony on false confessions, all were concerned with false confessions in a police interrogation setting.

In a case similar to the instant one, *State v. Smith*, 14-1744 (La. App. 1 Cir. 4/24/15); 2015 WL 1893288 (unpublished opinion), the defendant argued that the trial court erred in denying his motion to admit expert testimony on false confessions and on the influence of interrogation methods. He argued that this testimony would have assisted the jury in determining whether his statement that he was present during the murders was false. In *Smith,* the expert testified at the hearing regarding false confessions, noting that he had met with the defendant and determined that he had personality issues that made him vulnerable to pleasing others. The appellate court found no abuse of discretion in the trial court's ruling, finding that there was merit to the trial court's concerns regarding the scientific reliability and relevance of the expert's testimony. The first circuit noted that the defendant did not provide law enforcement with a confession; rather, he simply stated that he was at the park while someone else committed the crimes. Further, the appellate court asserted that the jury heard testimony regarding the length of

time that the defendant was interrogated, the receipt and waiver of his *Miranda* rights, and the content of the questions that led to the statement. Additionally, the first circuit found that because the expert did not indicate how or if studies related to false confessions translated into an ability to determine when a false confession had occurred or how often one may occur, it was unclear whether there was any way to test the accuracy of an unconfirmed confession. It also found that the jury was capable of using its common knowledge in deciding the issue of scientific reliability of the defendant's statement and was capable of understanding reasons that the statement may be unreliable without the assistance of expert testimony.

In *United States v. Dixon*, 261 Fed. Appx. 800 (5th Cir. 2008), the defendant argued that the district court abused its discretion by excluding Dr. DeClue's testimony regarding false confessions. Dr. DeClue never evaluated whether Dixon had given a false confession nor did he analyze the interrogation techniques used on Dixon. The district court made an oral ruling excluding Dr. DeClue's proffered testimony, concluding that "Dr. DeClue would ask the jury to apply a science in the abstract only, ... [with] too remote a connection between his testimony and the facts of this case...." The appellate court found that Dr. DeClue's proffered testimony did not apply recognized or accepted principles to Dixon's particular circumstances. It further found that Dr. DeClue offered only the general proposition that false confessions can occur. Accordingly, the appellate court found that even if the district court could have properly admitted the evidence, it was not "manifestly erroneous" to exclude it.

In the instant case, we find that the trial court did not abuse its discretion by excluding Dr. DeClue's testimony regarding false confessions. First, testimony on false confessions was not relevant in the instant case because Defendant did not confess to committing the crime. Rather, he said that he was in the cab attempting to sell fake drugs to the cab driver when Mr. Ratcliff shot the victim in the head.

Also, the jury heard Defendant's statements and testimony regarding the length of time that Defendant was interrogated, the circumstances surrounding the interrogation, the receipt and waiver of his *Miranda* rights, and the content of the questions that led to the statements. We conclude that the jury was capable of using its common knowledge in deciding the issue of reliability of Defendant's statements and was capable of understanding reasons that the statements might be unreliable without the assistance of expert testimony.

Further, Dr. DeClue did not meet and evaluate Defendant, nor did he meet the detectives who interrogated him. Dr. DeClue did not review the experience and training of the detectives, the interrogation techniques used, or a transcript of the *Atkins* hearing. In addition, Dr. DeClue indicated that he would be offering testimony that, based on his limited review of Defendant's records, Defendant was a vulnerable person. Also, he planned to offer testimony that interrogations can be contaminated when officers provide details of the crime to a defendant. However, Dr. DeClue acknowledged that the jury would determine whether contamination of the interrogation actually occurred. Considering the foregoing, we find that the trial court did not abuse its discretion by excluding Dr. DeClue's testimony from trial.

*ASSIGNMENT OF ERROR NUMBER SEVEN*

The prosecutor made improper statements during closing arguments.

*DISCUSSION*

Defendant argues that the prosecutors' closing arguments contained highly prejudicial unsupported theories that he was the shooter or was involved in the attempted armed robbery, which he contends were not based on any evidence presented at trial. Defendant also argues that in rebuttal closing arguments, the prosecutor misrepresented the population frequency for the two genetic markers

analyzed in the DNA profile, thus misstating the strength of the DNA evidence in this case and creating the impression that it was stronger than the evidence that was actually established.

Defendant further asserts that the prosecutor made statements during closing arguments, including that if a person was shot in the back of the head, he would fall forward. Defendant argues that no witness testified to such a conclusion. He points out that the prosecutor also stated during closing arguments that if someone puts a gun to the back of your head, you are going to turn, so the gun would then be positioned in the middle of the back of the head. He contends that the prosecutor also alleged that the shooter was smaller than the victim. Defendant notes that there was no testimony to support these statements.

Additionally, Defendant argues that during closing arguments, after conceding that it could not prove that defendant had blood on his jeans, the State shifted from proving its evidence to attacking how the defense thoroughly cross-examined DNA witnesses and mentioned the DNA statistics in closing arguments. He also argues that the State improperly shifted the burden in its closing arguments. Defendant asserts that the prosecutor's misconduct is grounds for reversal as it misled the jury about the law and the elements the State had to prove and misled the jury to misinterpret the evidence.

The State responds that Defendant's guilt was based on the evidence presented at trial, and therefore, its closing arguments were proper. The State further responds that it made an inadvertent mathematical miscalculation during its closing argument and that the numbers appear closer to 0.2 percent rather than 0.02 percent. However, it argues that although defense counsel objected, she did not articulate a basis for the objection; thus, this issue has not been preserved for review pursuant to La. C.Cr.P. art. 841(A). The State also argues

that raising this issue in a motion for new trial does not suffice to preserve it for review. It maintains, however, that if this Court should find that this claim has been preserved, Defendant is not entitled to relief. The State contends that the mistakes in its closing argument did not influence the jury or contribute to the verdict. It asserts that it told the jury during closing argument that the numbers were one in 339 but merely miscalculated how those numbers translated to percentages. It also asserts that the jury saw the evidence and was instructed that closing arguments were not evidence.

The State further responds that defense counsel did not object to the comments Defendant refers to in his brief, namely, that if you are shot in the back of the head you will fall forward and for the jury to use its common sense. As such, the State contends that these issues have not been preserved for review pursuant to La. C.Cr.P. art. 841(A). The State further notes that in any event, there was nothing improper about suggesting to the jury what "common sense" would show. With respect to Defendant's complaints of "burden shifting" in the State's closing argument, the State argues that calling into question why Defendant would take a certain course of action in arguing his case was not "burden shifting." Furthermore, the State points out that the jury was instructed that the State bears the burden of proof.

Defendant challenges comments made during the prosecutor's rebuttal argument regarding DNA probabilities, "burden shifting," and common sense. During his rebuttal argument, the prosecutor stated in pertinent part:

MR. RUSHTON:

Now, we talked to you briefly about the DNA. The DNA in this case I told you was not going to be the be-all, end-all. But I feel -- I feel like there -- it needs to be addressed, is that **this is not one in every 1300 people** walking around with that DNA. The DNA expert told you that's not true. That's a mischaracterization of the

evidence.  **It said one in 339 Caucasians that's consistent, consistent with one in 339.**

You have to remember that this is also not from the tip of the cap. You remember that tip of the cap piece of evidence was not enough to develop a full profile. It's from the -- it's from the inside of the cap where there were bloodstains that tested presumptively positive for blood. And this -- You remember when they went through the statistics here. This is -- And Anne Montgomery told you that this area here, you've got about **ten percent of the Caucasian population, you have -- this type here, about two percent. And you can multiply those together to figure out the statistics. And** one way to say that is one person in every 339. It's important to remember what that -- this population frequency. 2.95 to the negative 3. So one in 339 may sound like it was -- it is not like one in ten billion. Not even close. But we're still talking about .02 percent of the Caucasian population.

MS. CONNER:

Objection.

THE COURT:

Overruled.

MR. RUSHTON:

**.02 percent. That's something. And again, that's -- Move back three decimal places. And you're at .02. Just like here where we have ten percent, that's where that comes from.** Now, the jeans, maybe they got the wrong jeans. Maybe Quinice washed them, and they couldn't get a profile. Can't tell you much about the jeans.

But also Defense counsel spent all that time talking about the DNA. Why challenge that?

MS. CONNER:

Objection.

MR. RUSHTON:

They're –

MS. CONNER:

Burden-shifting.

MR. RUSHTON:

It's not burden-shifting, Judge. I'm asking why she make – I'm try -- asking them that question, why she's making that argument.

THE COURT:

Overruled.

MR. RUSHTON:

Thank you.

They're already saying that he's out there. Now they want to move him back outside the car, back to the first statement. That's what they're trying to do, trying to move him back outside the car to try to get you to disregard the DNA evidence even though it was their own expert that was hired by them just as well -- also by the State to come in here and testify about it.

Now, the real reason is because they know the evidence shows that Teddy Chester is in the back of that cab. He says it, Ms. Pollard says it, and the evidence is consistent with that when you look at the scene.

I want to talk about the scene. Now, if you recall, Chief Scanlan told you about how the -- basically can't really say what side of the -- what side of the seat the shooter was positioned based on just his -- just his looking at the bloodstain. He can't say it's consistent with the shot from the back, but it depends on the -- how the body was positioned right before that shot to figure out exact -- to say exactly where the shot came from.

And the Defense would have you believe that Elbert Ratcliff goes and is sitting right behind him, maybe Teddy Chester beside him, maybe not. They didn't really hone in on that. And that Elbert Ratcliff shot him from the back.

They're assuming. And the assumpt -- what they're assuming there is that you have is that John Adams is sitting straightforward in the seat and gets shot from the back here (indicating) at the time. But what you can see is how he's slumped over and back towards the middle. If you're shot in the back of the head, even at an angle, you're not going to -- **Common sense tells you you're not going to -- you're going to fall forward.**

Well, how does he end up like that? Now, we don't have a video camera to go inside that cab and come back and show you. But that – If you look at that positioning, when you think about the other evidence, you think about **what makes sense**. John Adams is coming there to pick up a fare at 713 Calhoun. That fare -- If somebody comes up and is outside the car talking to him about buying crack or something like that, you know -- they know -- you heard that he's not involved in that kind of thing. He's out of there. You've got to get somebody to get into the cab, pretend to be the fare, start to distract him. That's Elbert Ratcliff's role. Gets in, slides across, got the Guess shirt, starts talking to him about, hey, man, you want to buy this shirt, pretending to try to sell the shirt just like the defendant tells you.

Gets him distracted. That's when Teddy Chester gets in the -- in the seat behind the victim. Tells him to give it up. He said he tells you that Elbert Ratcliff says that. It's him doing it.
And how -- and how do you know that that's how it happened? **Use your common sense**. If someone puts a gun to the back of your head and says give it up, doesn't matter how cool you are. In that first moment when you feel the gun in the back of your head, you're going to turn. And as you turn, that gun that's in the middle of the back of your head, to the right side (indicating), with that gun pressed up against the Teddy Chester's finger on the trigger, goes off.

How do you know that's not Elbert Ratcliff? Defense counsel spent a whole lot of time talking to you about how big he is, how little Teddy Chester is. Having that bullet travel through John Adams' brain. Up. That shooter is much smaller than John Adams, and the physical evidence on the scene shows you that.

(Emphasis added).

Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. The State's rebuttal shall be

confined to answering the argument of the defendant. *See* La. C.Cr.P. art. 774; *State v. Honor*, 19-379 (La. App. 5 Cir. 1/29/20); 289 So.3d 249, *writ denied*, 20-370 (La. 7/24/20); 299 So.3d 72.

Prosecutors are allowed wide latitude in choosing closing argument tactics; however, this latitude is not without limits. *State v. Draughn*, 05-1825 (La. 1/17/07); 950 So.2d 583, 614, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); *State v. Greenup*, 12-881 (La. App. 5 Cir. 8/27/13); 123 So.3d768, 775, *writ denied*, 13-2300 (La. 3/21/14); 135 So.3d 617; *State v. Vansant*, 14-1705 (La. App. 1 Cir. 4/24/15); 170 So.3d 1059, 1063. A prosecutor should refrain from argument that tends to divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict. *State v. Messer*, 408 So.2d 1354, 1356 (La. 1982). Even where a prosecutor's argument has exceeded the scope of Article 774 or is deemed to be improper, a reviewing court should credit the good sense and fairmindedness of the jurors who have heard the evidence. *State v. Williams*, 96-1023 (La. 1/21/98); 708 So.2d 703, 716, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998).

The trial judge has broad discretion in controlling the scope of closing arguments, and a conviction will not be reversed on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *See Draughn*, 950 So.2d at 614; *Vansant*, 170 So.3d at 1063.

In *State v. Spencer*, 93-571 (La. App. 5 Cir. 1/25/94); 631 So.2d 1363, 1369, *writ denied*, 94-488 (La. 2/3/95); 649 So.2d 400, the defendant argued that the trial court erred in denying his motion for a mistrial after closing argument. This Court noted that the defense objected after the State had concluded its

rebuttal instead of immediately when the contested statement was made. This Court stated that the failure to contemporaneously object prevented the trial court from immediately remedying the situation if corrective action had been necessary. Similarly, in *State v. Paul*, 15-501 (La. App. 5 Cir. 1/27/16); 185 So.3d 188, 201, this Court, citing *Spencer, supra*, found that the defendant's failure to object during or after the State's closing arguments prevented him from raising the issue on appeal. This Court found that since the defendant did not contemporaneously object to the alleged inflammatory statement made by the State and only moved for a mistrial after the jury had retired for deliberation, the trial court did not have the opportunity to remedy the situation had corrective action been necessary.

In the instant case, Defendant argues that the prosecutor's closing arguments contained highly prejudicial unsupported theories that he was the shooter or was involved in the attempted armed robbery, which he contends were not based on any evidence presented at trial. However, as was discussed previously, a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the conviction. Contrary to Defendant's assertion, there was ample evidence to show that Defendant was the shooter or at least a principal to the shooting.

With respect to the prosecutor's argument about the DNA probabilities, Defendant is not entitled to relief. The record reflects that the prosecutor told the jury that the DNA probabilities regarding the blood found on the cap were one in 339 or .02 percent. The percentage would actually be approximately .29 percent. Even if the prosecutor told the jury an incorrect percentage, he correctly stated that it was one in 339 at approximately the same time he said it was .02 percent. Also, the jury had the benefit of seeing the actual evidence and was instructed that opening and closing arguments were not evidence. Further, we find that the

19-KA-363                                                66

DNA test results were cumulative since Defendant admitted to Lt. Sacks that he was present in the cab at the time of the shooting and that the blood on the cap belonged to the victim.

Considering Defendant's complaint that the prosecutor incorrectly shifted the burden during his rebuttal argument, the record reflects that the prosecutor informed the jury that the State had the burden of proof. Also, the prosecution calling into question why defense counsel would spend a lot of time talking about DNA evidence in her closing argument was not "burden shifting." The prosecutor drew the jury's attention to the fact that defense counsel wanted the jury to disregard the DNA evidence.

Also, defense counsel did not object when the prosecutor told the jury to use common sense when considering the evidence and what it showed. Therefore, the issue has not been preserved for review pursuant to La. C.Cr.P. art. 841(A). Nevertheless, even if the prosecutor's comments were outside the proper scope of closing arguments, we find that Defendant is still not entitled to relief. The court must be thoroughly convinced that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments. *State v. Franklin*, 15-1060 (La. App. 4 Cir. 8/24/16); 198 So.3d 1222, 1231, *writ denied*, 16-1754 (La. 9/6/17); 224 So.3d 982.

After reviewing the prosecutors' closing and rebuttal arguments, and considering the entirety of the record, we find that the jury verdict was reasonable based on the evidence presented by the State having found nothing in the record to demonstrate that the prosecutor's comments regarding common sense, burden shifting, or DNA probabilities so influenced the jury and contributed to the verdict that it would warrant a reversal of the conviction and sentence.

*ASSIGNMENT OF ERROR NUMBER EIGHT*

The State has not fulfilled complied with *Brady v. Maryland* requirement. [sic]

*ASSIGNMENT OF ERROR NUMBER NINE*

The trial court erred in permitting Quinice Pollard to testify.

*ASSIGNMENT OF ERROR NUMBER TEN*

The trial court prevented Mr. Chester from fully cross examining Quinice Pollard.

*DISCUSSION*

Defendant argues that the State failed to produce crucial evidence of Quinice Pollard's criminal history, which directly undermined her credibility and revealed her personal interest in cooperating with the prosecution. He contends that by doing so, the State violated his due process rights to exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). He further contends that on the eve of the retrial date, September 16, 2018, the State disclosed substantial new impeachment information regarding Ms. Pollard's criminal history from 1994 to 1996 that had never been produced. He asserts that the State did not provide documentation as to the disposition on these charges.

Defendant also argues that the trial court's ruling that the State could call Ms. Pollard as a witness after suppressing this critical evidence before trial for twenty-two years violated his due process rights. He maintains that without this information, his right to confront Ms. Pollard was violated. Additionally, he contends that the trial court limited defense counsel's cross-examination of Ms. Pollard. Defendant asserts that without the ability to cross-examine her regarding her bias in the first trial, and subsequent inconsistent testimony, the jury could not fully assess whether her testimony was first given in hope or in exchange for leniency in her criminal cases.

19-KA-363                                                    68

The State responds that prior to Defendant's second trial, it turned over information relative to Ms. Pollard's criminal record, and Defendant sought "*Brady* sanctions," claiming that the State should be penalized for this information supposedly not being turned over in advance of Defendant's first trial and further claiming that, because the information was incomplete, the State should be prohibited from calling Ms. Pollard as a witness. It further responds that the trial court twice denied the request for "*Brady* sanctions," that Defendant sought writs, and that this Court and the Louisiana Supreme Court denied writs. The State asserts that this Court ruled that any *Brady* violation prior to the first trial was cured by the granting of a new trial and further ruled that notwithstanding certain gaps in the information, there was nothing to demonstrate that the State withheld anything. The State also asserts that this Court further noted that Defendant would have an opportunity to cross-examine Ms. Pollard at trial.

The State submits that with respect to this portion of Defendant's argument, this Court should decline to revisit this issue under the law of the case doctrine as there is nothing new that justifies this Court revisiting its prior decision. The State argues that if this Court finds otherwise, its position is that the trial court did not err in denying the request for "*Brady* sanctions." It contends that it turned over everything in its possession and complied with its obligations pursuant to *Brady*. The State argues that it has no duty to provide Defendant with information which he already has or which he can obtain on his own with due diligence. It further argues that it cannot produce that which does not exist in the records and that it is unaware of any precedent dictating that the remedy for an incomplete criminal record of a State's witness is to forever bar that witness from testifying.

With respect to the Confrontation Clause, the State asserts that the

jurisprudence is clear that the Confrontation Clause guarantees only an opportunity for effective cross-examination. The State notes that while Defendant complains that the trial court curtailed the cross-examination into previous arrests, La. C.E. art. 609.1 restricts cross-examination to prior convictions. It also notes that although there is "somewhat" of a jurisprudential exception for pending charges leading to bias, Ms. Pollard had no pending charges at the time she testified at the second trial. The State asserts that the trial court followed the rules of evidence in disallowing Defendant from going into arrests where Ms. Pollard did not deny her convictions. It submits that Defendant extensively cross-examined Ms. Pollard relative to her inconsistent statements, her not being forthcoming to the police, her letters to and from Defendant, her alleged bias, and other aspects of her account. The State maintains that even if the trial court erred, which it denies, any error during cross-examination was harmless.

On September 17, 2018, Defendant filed Motion for Sanctions Based on *Brady* and *Giglio* Violation. In that motion, Defendant asserted that the day before trial, the State disclosed substantial impeachment information as to Quinice Pollard, namely, that she was arrested on March 18, 1996, for two counts of battery on a police officer, resisting an officer, and disturbing the peace, and that she had a 1996 charge for possession of a controlled dangerous substance. Defendant moved for sanctions based on the State's withholding of this information for two decades, including exclusion of Ms. Pollard as a witness at trial.

On September 19, 2018, at the hearing on the motion, after hearing arguments of counsel, the trial judge denied the motion for sanctions, stating, "And the information is certainly available now. It's not hard to understand, and it shouldn't delay the matters. You're certainly allowed to use it by law. I am not

going to exclude a witness at this point. The request for *Brady* sanctions is denied."

On September 24, 2018, Defendant filed Supplemental Motion for Sanctions Based on Prosecutorial Misconduct and Continued *Brady* and *Giglio* Violations. On that same date, at the hearing, defense counsel argued that records were missing regarding Ms. Pollard's criminal history, and therefore, she should be excluded from testifying. Defense counsel stated that according to the rap sheet given to the defense, Ms. Pollard was arrested on May 2, 1994, for resisting arrest and battery on a police officer and was sentenced to ninety days probation, which she violated; on November 21, 1995, she was arrested for a controlled dangerous substance; on November 28, 1995, she violated her probation; and on December 22, 1995, she was arrested on an attachment regarding that first probation and an additional charge of disturbing the peace.

Defense counsel asserted that at the time Ms. Pollard was interviewed in the instant case by Lt. Sacks, she had six charges of violation of probation and an attachment. Defense counsel pointed out that there was no information on JeffNet with respect to any of those charges and that the record had been missing since 1998. She noted that the record was missing for both of the co-defendants also. Defense counsel explained that there were issues in First Parish Court and at the 24th Judicial District Court and that it was suspicious that there were no entries between December of 1995 and 2013.

The prosecutor responded that there was no evidence of mass conspiracy to remove documents and be lenient with Ms. Pollard. He further responded that Ms. Pollard received no special consideration for her testimony for the upcoming trial. He also pointed out that defense counsel could question Lt. Sacks, Chief Deputy Scanlan, and Ms. Pollard at trial regarding any favors she might have been given. The prosecutor noted that he had provided defense counsel with Ms.

Pollard's "DOC" record which showed she was sentenced to two years.

After hearing arguments of counsel, the trial court denied the motion, stating, "Okay.  There are certainly - - there are certainly some questions here and missing - - some missing documents apparently. However, I don't think it's - - it supports the conclusions that Defense counsel's urging. And you certainly can cross-examine Ms. Pollard. And so, I am going to deny the motion."

Defendant filed a writ application with this Court challenging the trial court's ruling. This Court denied the writ, stating in pertinent part:

> On the showing made, we find that defendant is not entitled to the relief requested. First, any violations with respect to the State's failure to disclose information about Quinice Pollard's criminal history prior to the first trial have been remedied by the granting of a new trial. Second, the State did comply with its duty to provide relator with exculpatory information prior to the second trial. We acknowledge relator's argument that the information disclosed by the State had gaps in the time periods relating to the records provided and therefore left many unanswered questions. However, we have nothing to suggest that the State withheld any exculpatory information or committed any type of prosecutorial misconduct with regard to the disclosure of information. Third, defense counsel will have the opportunity to cross-examine the State's witnesses at this second trial, including the opportunity to cross-examine them, as allowed by law, about Quinice Pollard's criminal history as well as the time gaps and missing information in the documents provided by the State.

*See State v. Chester*, 18-558 (La. App. 5 Cir. 10/16/18) (unpublished writ disposition), *writ denied*, 18-1747 (La. 10/26/18); 254 So.3d 695.

The arguments presented by Defendant herein are essentially the same as those made in his prior writ application. Under the discretionary principle of law of the case, an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case.  *State v. Burciaga*, 05-357 (La. App. 5 Cir. 2/27/06); 924 So.2d 1125, 1128; *State v. Junior*, 542 So.2d 23, 27 (La. App. 5 Cir. 1989); *writ denied*, 546 So.2d 1212 (La. 1989). The principle is applicable to all decisions of an appellate court, not solely those arising from full

appeal. *State v. Johnson*, 06-859 (La. App. 5 Cir. 4/11/07); 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue, but it will not be applied in cases of palpable former error. *Id.* Reconsideration is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *State v. Davis*, 03-488 (La. App. 5 Cir. 11/12/03); 861 So.2d 638, 641 n.2, *writ denied*, 03-3401 (La. 4/2/04); 869 So.2d 874; *In re K.R.W., Jr.*, 03-1371 (La. App. 5 Cir. 5/26/04); 875 So.2d 903, 905.

Here, Defendant has failed to cite to any new facts adduced at trial or additional jurisprudence tending to indicate that this Court's prior disposition was patently erroneous and produced an unjust result. However, since prior denial of supervisory writs does not preclude reconsideration of the issue on appeal, the merits of Defendant's assignment will be addressed. *See State v. Castleberry*, 98-1388 (La. 4/13/99); 758 So.2d 749, 755, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); *State v. Cowart*, 01-1178 (La. App. 5 Cir. 3/26/02); 815 So.2d 275, 290, *writ denied*, 02-1457 (La. 5/9/03); 843 So.2d 387.

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97. Since *Brady*, the Supreme Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused. *See United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The Supreme Court has also held that the duty encompasses impeachment evidence as well as exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87

L.Ed.2d 481 (1985).

The Supreme Court has also explained that such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. 473 U.S. at 682, 105 S.Ct. 3375, 3380; *see also Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565-66, 131 L.Ed.2d 490 (1995). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley*, *supra* at 682, 105 S.Ct. 3375. Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id*. 514 U.S. at 437, 115 S.Ct. 1555.

Synthesizing the *Brady* jurisprudence, the Supreme Court held in 1999 that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

However, *Brady* does not relieve the defendant of his obligation to conduct his own investigation, and the State is not obligated under *Brady* and its progeny to furnish the defendant with information that he already has or that he could obtain with reasonable diligence. *State v. Crawford*, 15-0784 (La. 10/2/15); 176 So.3d 394, 395-396, *cert. denied*, - - U.S. - - , 136 S.Ct. 1454, 194 L.Ed.2d 557 (2016).

In the instant case, we find that the trial court did not err in denying the *Brady* motion for sanctions. As this Court pointed out, any violations with

respect to the State's failure to disclose information about Ms. Pollard's criminal history prior to the first trial have been remedied by the granting of a new trial. Additionally, the record indicates that several hearings were held prior to the second trial wherein the prosecutor said that he had turned over everything in his possession regarding Ms. Pollard's criminal history. As such, the State complied with its duty under *Brady*. Although there appears to be missing information in the criminal records, there is no evidence that the State withheld any exculpatory information or committed any type of prosecutorial misconduct with regard to the disclosure of the information in question. Based on the foregoing, we find that the trial court did not err in denying the *Brady* motion for sanctions.[11]

Defendant also argues that without Ms. Pollard's complete criminal records, his right to confront Ms. Pollard was violated. Additionally, he contends that the trial court erred by limiting defense counsel's cross-examination of Ms. Pollard.

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution specifically and expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. Art. I, § 16. *See also State v. Robinson*, 01-273 (La. 5/17/02); 817 So.2d 1131, 1135. Confrontation not only means the ability to confront the witnesses physically but also to secure for the opponent the opportunity of cross-examination, which is its main and essential purpose. *Id.* Cross-examination is the principal way to test the believability and

---

[11] *See State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, *cause dismissed*, 2010- Ohio-3887, 126 Ohio St. 3d 1538, 932 N.E.2d 334. In that case, the defendant filed a motion for the preservation and production of video logs, surveillance footage, written logs, or other records from a certain store, and all of a witness's criminal records. However, the appellate court noted that there was nothing in the record to indicate the State actually obtained any of these materials. Moreover, the appellate court found that the defendant failed to prove that these missing materials contained materially exculpatory evidence. The appellate court concluded that the State did not violate *Brady*.

truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. *Id.* The Confrontation Clause guarantees only an opportunity for effective cross-examination, not examination that is effective in whatever way, and to whatever extent, the defense might wish. *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

In a criminal case, every witness, by testifying, subjects himself to limited examination relative to his criminal convictions. *See* La. C.E. art. 609.1(A). Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. La. C.E. art. 609.1(C). Generally, evidence of arrests for which there has not been a conviction is not admissible upon the issue of credibility. La. C.Cr.P. art. 609.1(B); *Washington*, 866 So.2d at 979-80. However, evidence of an arrest may be admissible for impeachment purposes when it is independently relevant to show bias. *State v. Robinson*, 337 So.2d 1168, 1171 (La. 1976). Pending criminal charges are relevant not to the witness's general credibility but to her bias or interest as relating to the hope of receiving leniency from the State. *State v. Wiley*, 10-811 (La. App. 5 Cir. 4/26/11); 68 So.3d 583, 592, *writ denied*, 11-1263 (La. 3/30/12); 85 So.3d 106. The trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. *State v. Gross*, 12-73 (La. App. 5 Cir. 2/21/13); 110 So.3d 1173, 1183, *writ denied*, 13-661 (La. 10/25/13); 124 So.3d 1091.

The record reflects that during direct examination, Ms. Pollard testified that she pled guilty to disturbing the peace, a misdemeanor, in 1994; that she was convicted of possession with intent to distribute cocaine in 1994; and that she was convicted of theft of goods, a felony, in 1998. Ms. Pollard also testified that the two assistant district attorneys did not promise her anything for her testimony in the second trial and that she never felt pressured by them to testify.

During cross-examination, defense counsel asked Quinice if she had been arrested in May of 1994 for battery on a police officer and resisting arrest. The prosecutor objected, noting that Quinice had not denied her convictions. The trial court stated that only the prior convictions were admissible. Defense counsel argued that Quinice had charges that were still pending; however, the prosecutor responded that there were no charges pending. The trial judge then sustained the objection.

Defendant argues that this Court stated in its writ disposition that he would have the opportunity to cross-examine witnesses. However, when reviewing this Court's disposition, this Court made it clear that defense counsel would have the opportunity to cross-examine the State's witnesses at the second trial, as allowed by law, regarding Ms. Pollard's criminal history as well as the time gaps and missing information in the documents provided by the State. A review of the record shows that the trial judge followed the rules of evidence, i.e., Article 609.1, by denying defense counsel's request to question Ms. Pollard about her arrests when she did not deny her convictions.

The record also shows that defense counsel thoroughly cross-examined Ms. Pollard regarding her criminal history, her inconsistent statements, her not being forthcoming to the police, and her letters to and from Defendant. With respect to bias, defense counsel was able to elicit from Ms. Pollard during cross-examination that she may have had a bias to cooperate with the State during the first trial. Ms. Pollard testified that in the fall of 1995, she sold crack cocaine rocks once or twice because she needed the money. She further testified that there were a couple of times between October of 1995 and March of 1996 when she missed court dates and that in March of 1996, she had several attachments out for her arrest for several different cases. Ms. Pollard recalled that for her crack cocaine charge, she was placed on probation and that she was "backing

up" two years on probation. She indicated that she was not facing time for any of her charges and that she just had attachments to go to court.

Additionally, defense counsel elicited from Ms. Pollard that in the letters to and from Defendant, she was worried about going to jail for her charges and had been missing court dates. Ms. Pollard testified that in a letter dated April 8, 1996, she indicated to Defendant that she received two years of probation. She then testified that she was facing two years imprisonment if she violated her probation. Also, during closing arguments, defense counsel made extensive arguments regarding Ms. Pollard's possible bias for testifying.

Accordingly, we find that the trial court did not abuse its discretion by limiting the cross-examination of Ms. Pollard. Also, even if the trial court did err, we find that any error was harmless since defense counsel was able to elicit the testimony regarding possible bias during her cross-examination of Quinice.

*ASSIGNMENT OF ERROR NUMBER ELEVEN*

The trial court violated Mr. Chester's Sixth Amendment Right to a public trial.

*DISCUSSION*

Defendant argues that the trial court violated his Sixth Amendment right to a public trial by denying members of his legal team to be present for parts of voir dire. He asserts that prior to jury selection, defense counsel requested that all State and defense strikes be made outside the presence of the jury. Defendant notes that the trial court agreed to remove the jury during cause and peremptory challenges, but it only allowed Defendant and counsel of record to remain in the courtroom. He states that in his motion for new trial, he argued that the trial court's complete closure of the courtroom violated his constitutional right to a public trial and deprived the public of the opportunity to observe and listen to the State's justifications for cause and peremptory strikes. Defendant argues that this was a

structural error, and this Court must grant a new trial.

The State responds that Defendant's public trial claim was not preserved for review pursuant to La. C.Cr.P. art. 841. The State points out that defense counsel himself suggested clearing the courtroom during the challenges and that Defendant at no point, either during the "arrangement" or during voir dire itself, objected to this closure. It argues that while Defendant now complains that he did not want the other members of the defense team, members of the public, or his family excluded, he in no way whatsoever objected to their exclusion. The State further argues that although Defendant raised this claim in his motion for new trial, that claim was too late and does not suffice as a contemporaneous objection under La. C.Cr.P. art. 841(A). It added that public trial claims have been found to be subject to the contemporaneous objection rule in La. C.Cr.P. art. 841(A).

The State contends that although this Court need not and should not reach the merits, it notes that challenges are usually done at the bench outside of the view of the public pursuant to La. C.Cr.P. art. 795. It further contends that if the procedure Defendant complains of violates the right to a public trial, so does Article 795(B)(2), as in either event the public is essentially excluded from challenges. The State submits that in neither instance is there a violation of the right to a public trial as the public is able to observe voir dire minus the challenges and that transcripts of challenges are later available to the public.

The record reflects that the following colloquy occurred prior to voir dire regarding defense counsel's desire to clear the courtroom for challenges:

MS. CONNER:

The last remaining issue that I think we have is -- is with respect to doing the cause and peremptory challenges. I understand it's the custom of the Court to do those at the bench. We've discussed this previously with respect to this case that Mr. Chester has adamantly invoked his right to be present at all critical stages of the trial, including whether or not certain jurors are

selected and how their cause challenges and how his peremptory strikes are exercised.

So I don't know how the Court can accommodate Mr. Chester, if it's bringing him to the bench when we do those selections or clearing the courtroom, which is done in many -- I know it's not the practice here, but it's done -- In all the trials that I've done, we have cleared the courtroom to put all the objections on the record.

THE COURT:

Well, the practice that we have here is you're free to go back and talk to Mr. Chester. He's not allowed to approach the bench. The defendant always sits at the -- at the counsel table. And it's a matter of security.

Counsel can come -- go back and forth and discuss the issues with Mr. Chester as you see fit. If you're not satisfied with that, then we can clear the courtroom.

MS. CONNER:

Thank you, Your Honor. I anticipate that we may need to clear the courtroom, so -- just so that -- I don't know if additional security needs to be called for that purpose or prearrangements need to be made, but I anticipate that coming up.

THE COURT:

Well, we need to resolve that issue now so that we're ready. Either -- I mean, it's going to involve removing 50 jurors and –

THE LAW CLERK:

And they can't stand in the hall, so we've got to find a place to put them.

THE COURT:

Logistically it's complicated. But if that – I'll let you make that call.

I think that defendants participate fully in the way that we do it. But if you are not satisfied with that, we can go through the more cumbersome approach of removing all -- clearing the courtroom and removing all the -- all the --

MS. CONNER:

I think we need to do that. (Off-the-record discussion.)

THE COURT:

Okay, all right. We may have the courtroom across the
way open.

MS. CONNER:

Okay.

THE COURT:

Which would be most convenient.

MS. CONNER:

Thank you, thank you.

After the first panel of jurors completed voir dire, the trial court ordered the bailiff

to remove the venire to across the hall. The trial judge then stated:

Yeah, okay. And ladies and gentlemen, those of you
that are remaining in the court room, I'm going to clear
the court for this portion of voir dire. This is not a part
that the public gets to participate in, or gets to observe.
Only the defendant and counsel of record can remain in
the courtroom.

Defense counsel replied, "Okay, thank you." The transcript indicates the

courtroom was cleared at that time.

After Defendant was convicted, he filed a Motion for New Trial on

December 12, 2018. In that motion, Defendant argued that he was denied his

Sixth Amendment right to a public trial when the trial court cleared the courtroom

during cause and peremptory challenges. A hearing was held on the motion. At

that hearing, Defendant's appellate counsel argued that the trial court had

prohibited Defendant from having a public trial by clearing the courtroom during

the challenges. She noted that the trial court required members of the defense

team to also leave at that time.  The trial judge reminded Defendant's appellate

counsel that the courtroom was cleared at defense counsel's request and that she did not recall any objection to members of the public being excluded because she allowed anybody who was enrolled to stay.

Defendant's appellate counsel disagreed and said that as a member of the legal defense team, she requested to stay, but the trial judge told her only counsel of record was allowed to stay. The trial judge asked appellate counsel if she had addressed the court at that time, and she said, "no" and that she was in the back of the room talking to someone else. The trial judge confirmed that appellate counsel was not enrolled at the time. Appellate counsel argued that Defendant's trial counsel said at one point during the trial that the people in the first row were members of the defense team. Appellate counsel thought it was clear to the trial judge that she was assisting Defendant in his defense.

The prosecutor responded that defense counsel requested that the courtroom be cleared so Defendant could listen to the challenges. He noted that it was an unusual procedure in the 24th Judicial District Court. He further responded that there was another alternative, namely, for the challenges to be done at the bench while Defendant sat at the defense table where his counsel could discuss with him what had occurred at the bench. Following the arguments of counsel, the trial judge denied the motion for new trial without providing reasons.

As provided in the Sixth Amendment of the United States Constitution and Article 1 § 16, of the Louisiana Constitution, in a criminal case, the accused is afforded the right to enjoy a public trial. However, the right to a public trial is not absolute. *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). La. C.Cr.P. art. 795 provides:

> Peremptory challenges of jurors shall be made and
> communicated to the court in a side bar conference of the
> judge, the attorneys conducting the examination and selection

of jurors, and the defendant in a case in which the defendant chooses to represent himself. The conference shall be conducted in a manner that only the court, the attorneys, and the defendant in a case in which the defendant chooses to represent himself, are aware of the challenges made until the court announces the challenges without reference to any party or attorney in the case.

Public trial claims regarding closures of courtrooms have been found to be subject to the contemporaneous objection rule in La. C.Cr.P. art. 841. In *State v. Sias*, 03-891 (La. App. 3 Cir. 12/10/03); 861 So.2d 829, the defendant was present during all portions of the jury selection process except the in chambers discussions wherein jury challenges were exercised. The court minutes indicated defense counsel was present during all three conferences held in chambers. At no time did the defendant or defense counsel object to the challenging of jurors being held in chambers, off the record, and out of the presence of the defendant. Accordingly, the third circuit found that these issues were not preserved for review, citing La. C.Cr.P. art. 841. *Id.* at 833; *State v. Luckey*, 16-494 (La. App. 5 Cir. 2/8/17); 212 So.3d 1220, 1230-31, *writs denied*, 17-432 (La. 10/27/17); 228 So.3d 1225 and 17-617 (La. 10/27/17); 228 So.3d 1234.

In the instant case, defense counsel asked the trial court to clear the courtroom during the challenges so Defendant could hear those challenges. The trial judge attempted to have defense counsel follow the usual procedure of making arguments for the challenges at the bench while Defendant was seated at the defense table pursuant to Article 795. She explained that if defense counsel needed to discuss the challenges made at the bench with Defendant, she could go back to the defense table and discuss those issues with him. Nevertheless, defense counsel insisted that the courtroom be closed during the time the challenges were made. At no point did Defendant or his counsel object to this closure. Defendant's appellate counsel testified at the hearing on the motion for new trial that she was part of the legal defense team and wanted to be present for

the challenges; however, she admitted that she did not make this known to the trial court at that time. Although Defendant now complains that his legal defense team was improperly excluded, he made no contemporaneous objection to this at the time it occurred. Therefore, we find that Defendant has failed to preserve this issue for review. By failing to lodge a contemporaneous objection, he is precluded from raising this issue on appeal pursuant to La. C.Cr.P. art. 841.

Additionally, Defendant indicates that the issue can be reviewed on appeal because it was raised in his motion for new trial. By way of analogy, in *State v. Parker*, 506 So.2d 675, 682-83 (La. App. 5th Cir. 1987), *writ denied*, 512 So.2d 456 (La. 1987), the defendant asserted on appeal that the technical requirements regarding the polling of the jury may not have been followed; however, he failed to make a contemporaneous objection at trial to the procedure used to poll the jury, and the trial court was not afforded an opportunity to comply with the technical requirements. This Court found that although the defendant raised this issue in his motion for new trial, he failed to make a contemporaneous objection in accordance with La. C.Cr.P. art. 841, to the polling procedure used, and thus, the procedure could not be reviewed on appeal. Similarly, in this case, we find that Defendant raising his claim in his motion for new trial does not suffice as a contemporaneous objection under La. C.Cr.P. art. 841. Also, pursuant to La.C.Cr.P. art. 795, the public is not allowed to be present during the jury challenges made at the bench. This assignment of error is without merit.

*ASSIGNMENT OF ERROR NUMBER TWELVE*

Prosecutors' use of peremptory strikes violated *Batson v. Kentucky*.

*ASSIGNMENT OF ERROR NUMBER THIRTEEN*

The trial court improperly conducted three-step *Batson* analysis. [*sic*]

*DISCUSSION*

Defendant argues that the State's use of peremptory strikes violated *Batson*

*v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He contends that the defense raised *Batson* objections, after which the trial court found that the defense had satisfied its burden of establishing a prima facie case of racial discrimination. Defendant asserts that the trial court erroneously curtailed the *Batson* analysis when it improperly combined stages two and three and refrained from the third stage of inquiry into whether race discrimination played a part in the State's exercise of peremptory strikes. Defendant also argues that the trial court erred by accepting the State's reasons for challenging Bryan Vigne and Dareen Adams. He further asserts that the State accepted certain jurors even though they had family members with criminal histories yet struck Mr. Vigne and Ms. Adams for those same reasons.

The State responds that the trial court did not err in accepting its race-neutral reasons for challenging Mr. Vigne and Ms. Adams and in denying all of Defendant's *Batson* challenges. It contends that given the leeway provided to trial courts in adjudicating *Batson* claims, the trial court complied with the three steps of *Batson*. The State explains that while the trial court's language was suggestive of placing an "extra burden" on the State, which it contends benefitted Defendant.

The trial court found that the State's strikes were not based on racial motivations after considering the State's offered reasons and Defendant's arguments. The State further responds that while Defendant attempts to second-guess its reasons by pointing to other prospective jurors who had family members who had committed crimes, none rose to the same level as Ms. Adams, who had a nephew who killed someone and who had other nephews and a son involved in drug crimes.

The record reflects that during voir dire, the prosecutor used a peremptory challenge on Carl Saint-Louis, after which defense counsel raised a *Batson*

objection. Defense counsel explained that the State had used four out of five of its peremptory strikes on African-American jurors. She further explained that as of the previous night, there were eleven African-American jurors called to the box. Defense counsel asserted that ten of these eleven were removed by the State through cause or peremptory strikes and that three out of four were peremptory challenges. She further asserted that presented a prima facie case of race discrimination based on the statistics.

The prosecutor responded that with respect to the statistics on a prima facie case, cause challenges were not to be considered and not part of the analysis for a prima facie case. The State, the defense, and the trial judge then reviewed the challenges made to the following African-American jurors: Bryan Vigne, Christopher Garrett, Dareen Adams, and Carl Saint-Louis. After reviewing the challenges, the trial judge found that the defense had established a pattern and that she was going to require the State to articulate legitimate, nondiscriminatory reasons for its use of those strikes.

The prosecutor responded that he had three reasons for striking Mr. Vigne. First, he stated that Mr. Vigne was on the jury for the Danzinger Bridge case in Orleans Parish ten years prior, which was an emotionally charged case that was not "run-of-the-mill." Second, the prosecutor explained that Mr. Vigne had a conviction for disturbing the peace after being arrested for battery on a police officer and a conviction for possession of marijuana.[12] He noted that because Mr. Vigne felt "they" were treated fairly, he did not move for cause. Third, the prosecutor stated that Mr. Vigne said that he would not require the State to prove its case beyond all possible doubt, but it would be very hard to convict someone and to convince him beyond a reasonable doubt.

---

[12] Mr. Vigne actually testified that his son was convicted of possession of marijuana.

The trial judge stated that with respect to Mr. Vigne, she did not find the State's reason about the Danzinger Bridge case to be convincing. She believed that case ended in pleas. However, the trial judge found that the other reasons articulated by the State were valid and satisfied the standard of articulating a legitimate nondiscriminatory reason for the strike. Defense counsel pointed out that Mr. Vigne stated that he was treated fairly in his prosecution for battery on a police officer. She noted that disturbing the peace was a very minor charge. The trial judge replied that the fact that Mr. Vigne was convicted was enough. She then found that the State had met its burden with respect to Mr. Vigne.

With respect to Mr. Garrett, the prosecutor said he initially raised a cause challenge because of the issue with not being able to keep the delay (from the time of the offense to trial) out of his mind. The prosecutor stated that although Mr. Garrett later said he would follow the law, he chose to exercise a peremptory challenge "on that change of heart." Defense counsel responded that it was her recollection that he would be "a very State-positive juror" and that he had no curiosity about the delay in the proceedings. The trial judge responded that her notes were consistent with what the State articulated, that it was a close question with respect to cause, and that it was reasonable for the State to exercise one of its peremptory challenges on him. She found that the State had "satisfied their burden." She noted that the State struck him because of his initial responses, and she thought that was "fair."

Later on, the trial judge asked the prosecutor his reason for striking Ms. Adams, a Black woman. The prosecutor responded that Ms. Adams had a nephew who was convicted of second degree murder. He recalled her saying that her nephew was treated fairly, which was why he did not raise a cause challenge. The prosecutor pointed out that Ms. Adams also had nephews who had been convicted, as well as a son who was arrested, for drug violations, which appeared

to him to be a primary part of their defense. He stated that those were the reasons they chose to strike Ms. Adams.

Defense counsel argued that she did not get the impression from Ms. Adams that she felt sympathetic to her son and nephew being arrested for those crimes. She said it appeared that Ms. Adams disapproved of her family members being arrested and convicted. Defense counsel asserted that Ms. Adams had said that she had friends, cousins, and nephews in law enforcement and noted that she served on a jury three times. She argued that those reasons were not sufficiently race-neutral reasons.

The trial judge responded that she thought the reasons articulated by the State were race neutral, and therefore, she found that the standard was satisfied. She recalled that Ms. Adams' nephew was convicted of second degree murder with a bat. The trial judge again found that was a race-neutral reason articulated by the State.

With respect to Mr. Saint-Louis, the prosecutor said that he "moved for cause for the reasons that we stated for the cause."[13] He stated that although the trial judge had found that he was rehabilitated, his "back-and-forth" on "this issue" that is "going to be a major factor in the case causes concern enough to exercise a peremptory strike." Defense counsel argued that she felt that he was "very strong on him having thought about it and come to a reasonable change of his mind" and that he could "put it out of his mind." She noted that he and his friends were in law enforcement. The trial judge stated that Mr. Saint-Louis gave equivocal answers, and she indicated that the State's reason was race neutral. The trial judge further stated that although she agreed he had been rehabilitated, the

---

[13] The record reflects that Mr. Saint-Louis initially indicated that he could not put aside any curiosity or speculation that he may have about the delay in this case from the time of the offense until trial. The State later challenged him for cause, arguing that he had given two completely conflicting answers, one to the State and one to the defense, regarding the delay. The trial court then brought Mr. Saint-Louis back in for additional questioning. After lengthy questioning, the trial judge found that Mr. Saint-Louis had been rehabilitated.

fact that his initial response was very strong the other way was sufficient for the State to not want him on the jury. She also asserted that she was making a finding that the State had satisfied its burden of articulating legitimate nondiscriminatory reasons for the strikes that it had made and that it had satisfied its burden.

Later on, defense counsel also raised a *Batson* challenge to Doreen Carter. The trial judge said she believed the State was required to articulate a legitimate race-neutral reason for its strike of Ms. Carter. The prosecutor stated that Ms. Carter was initially quite firm that she could not vote guilty knowing it was a life sentence. He explained that although she was rehabilitated, he was concerned that her original feelings would remain. The trial judge said that this situation was similar to some other ones where the person came very close to being stricken for cause and had some very strong statements that were ultimately rehabilitated to some extent. The trial judge said that she understood the State's concern, given the strong statements initially. She thought that the State had articulated a legitimate race neutral reason with respect to Ms. Carter.

Defense counsel lodged another *Batson* objection when the State struck Charles Ferguson. The trial judge said that in light of the pattern, the State would be required to provide race-neutral reasons. The prosecutor explained that Mr. Ferguson had the same problem with the life sentence as Ms. Carter did. The trial judge found that the State had articulated a legitimate nondiscriminatory race-neutral reason to strike Mr. Ferguson. She said that her notes were consistent with what had been mentioned by both the State and the defense regarding the life sentence, Mr. Ferguson's statements that only God could judge, and the delay.

The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory

challenges.  In *Batson v. Kentucky*[14], *supra*, the United States Supreme Court held

that an equal protection violation occurs when a party uses a peremptory

challenge to exclude a prospective juror on the basis of race.  The Louisiana

Legislature codified the *Batson* decision in La. C.Cr.P. art. 795(C), which

provides that no peremptory challenge made by the State or the defendant shall

be based solely upon the race or gender of the juror.  *State v. Massey*, 11-357

(La. App. 5 Cir. 3/27/12); 91 So.3d 453, 467, *writ denied*, 12-991 (La. 9/21/12);

98 So.3d 332.  Article 795(C) further provides that if an objection is made that

either the State or defense has excluded a juror solely on the basis of race, and a

prima facie case supporting that objection is made by the objecting party, the

court may demand satisfactory race-neutral reasons for the exercise of the

challenge, unless the court is satisfied that such reason is apparent from the voir

dire examination of the juror.

The Court in *Batson* outlined a three-step test for determining whether a

peremptory challenge was based on race.  *State v. Cheatteam*, 07-272 (La. App. 5

Cir. 5/27/08); 986 So.2d 738, 743. Under *Batson*, the defendant challenging the

peremptory strike must first establish a prima facie case of purposeful

discrimination.  *State v. Victor*, 11-45 (La. App. 5 Cir. 11/15/11); 82 So.3d 301,

311. Second, if a prima facie showing is made, the burden shifts to the State to

articulate a race-neutral explanation for the challenge.  *State v. Sparks*, 88-17 (La.

5/11/11); 68 So.3d 435, *cert. denied*, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d

621 (2012). Unless discriminatory intent is inherent in the prosecutor's

explanation, the reason offered will be deemed race neutral.  *Purkett v. Elem*, 514

U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam); *State

v. Massey*, 91 So.3d at 468. Third, the trial court then must determine if the

---

[14] *Batson v. Kentucky*, 476 U.S. 79; 106 S.Ct. 1712; 90 L.Ed.2d 69 (1986), holding modified by *Powers v. Ohio*, 499 U.S. 400; 111 S.Ct. 1364; 113 L.Ed.2d 411 (1991).

defendant has carried his or her ultimate burden of proving purposeful discrimination. *Sparks, supra.* The ultimate burden of persuasion as to racial motivation in exercising a peremptory challenge rests with, and never shifts from, the opponent of the challenge. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771; *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

To establish a prima facie case, the defendant must show: (1) the prosecutor's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of his being a member of that cognizable group. *Massey*, *supra* (citing *Sparks*, *supra*). A trial judge's demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose. *Id.* If the prima facie showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.* In any case, after the State offers a race-neutral explanation for the peremptory challenge, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing becomes moot. *Id.*

Whether there has been intentional racial discrimination is a question of fact. *State v. Edwards*, 06-643 (La. App. 5 Cir. 3/27/07); 957 So.2d 185, 194, *writ denied*, 08-1988 (La. 8/29/08); 989 So.2d 110. The trial court's evaluations of discriminatory intent are to be accorded great deference on review and should not be reversed unless they are clearly erroneous. *See State v. Florant*, 12-736 (La. App. 5 Cir. 5/23/13); 119 So.3d 635, 642, *writ denied*, 13-1451 (La. 1/10/14); 130 So.3d 319.

In *Sparks*, 68 So.3d at 474-75, the defendant contended that because the

trial judge did not assess on the record the weight and credibility of the prosecutor's explanation and articulate a reason for accepting the prosecution's reason as race neutral, the trial judge did not complete the third step of the *Batson* framework, resulting in an inability for there to be meaningful review. The supreme court found that to the contrary, although the better practice was for the trial court to establish for the record its evaluation of the justification offered to rebut the inference of purposeful discrimination, the trial court did not err in failing to rule expressly, when the reason given by the State was facially race neutral, self- explanatory, and related to the case. The supreme court found that there was no discriminatory intent inherent in this explanation. In *Sparks*, the supreme court stated that neither *Batson* nor any of its progeny had established guidelines for a trial court performing step three of the analysis, citing *Pruitt v. State*, 986 So.2d 940, 946 (Miss. 2008) ("*Batson* ... did not articulate a particular means of accomplishing the third step.... The Supreme Court has not since required trial courts to employ any specific process in carrying out steps two and three of the *Batson* procedure. On the contrary, the Supreme Court has stated '[w]e adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it.'")

In *State v. Johnson*, 18-523 (La. App. 3 Cir. 2/6/19); 265 So.3d 1034, 1039-51, *writ denied*, 19-312 (La. 5/28/19); 273 So.3d 314, the defendant contended that the trial court erred in failing to carry out the third step of the *Batson* analysis by not determining whether the State was being intentionally discriminatory when exercising its peremptory challenge of Mr. Jones. The State offered that its reason for removing Mr. Jones was that he was inattentive. Although the trial court stated it had not noticed Mr. Jones being inattentive, it nonetheless found the State had offered a valid race-neutral reason for removing Mr. Jones from the jury. The third circuit found that because the State gave a jurisprudentially

recognized, race- neutral reason for its peremptory challenge of Mr. Jones, no further evaluation or explanation was needed from the trial court unless the trial judge made a finding that the prosecutor's reasons were not credible. The third circuit found that the State's proffered explanation was "facially race-neutral, self-explanatory and related to the case." It further found that in light of *Sparks*, the trial court's finding that the State gave a race-neutral reason for striking Mr. Jones was sufficient to satisfy the *Batson* analysis.

In the instant case, the record reflects that the prosecutor gave three reasons for his peremptory challenge of Mr. Vigne, i.e., Mr. Vigne's jury service on a high- profile case, Mr. Vigne's conviction of disturbing the peace[15] after being arrested for battery on a police officer, and Mr. Vigne's indication that he had problems with the reasonable doubt standard of proof. With respect to Ms. Adams, the prosecutor responded that he was using a peremptory challenge because she had a nephew who was convicted of second degree murder and because she had nephews who had been convicted, as well as a son who was arrested for drug violations.

The Louisiana Supreme Court has found that striking a juror on the basis that the juror has prior convictions is a legitimate race-neutral reason. *See State v. Bender*, 13- 1794 (La. 9/3/14); 152 So.3d 126, 129. Prior criminal history has long been considered a valid reason to peremptorily excuse a prospective juror. *See State v. Heard*, 40,284 (La. App. 2 Cir. 12/14/05); 917 So.2d 658, 665, *writs denied*, 06-188 (La. 6/16/06); 929 So.2d 1285 and 06-781 (La. 10/6/06); 938 So.2d 71. This Court has also found that a juror having a family member with a

---

[15] Defendant argues that Mr. Vigne did not have a conviction. During voir dire, the trial judge asked Mr. Vigne if he or any family member had been the victim of a crime. Mr. Vigne responded:

> Well I have…I didn't get convicted for it, but I was arrested for battery to a police officer actually in Jefferson, at Jefferson. But they changed it to disturbing the peace.

He indicated that it was a misdemeanor. After reviewing the record, it appears that Mr. Vigne was convicted of the misdemeanor of disturbing the peace.

criminal record is also a race-neutral explanation. *See State v. Wilson*, 09-170 (La. App. 5 Cir. 11/10/09); 28 So.3d 394, 404 n.4, *writ denied*, 09-2699 (La. 6/4/10); 38 So.3d 299.

Further, this Court has found that a prospective juror's holding the State to a higher burden of proof is a valid race-neutral reason for a peremptory strike. *See Florant*, 12-736, 119 So.3d 635 at 645.

Once the prosecutor provided race-neutral reasons for his strikes, the trial judge found that the reasons the State provided for striking Mr. Vigne were "valid" and "satisfied the standard of articulating a legitimate nondiscriminatory reason for the strike" and that "the State had met its burden with respect to Mr. Vigne." With respect to Ms. Adams, the trial judge responded that she thought the reasons articulated by the State were race neutral, and therefore, she found that "the standard was satisfied." With respect to Mr. Vigne, the trial judge did not say whether Defendant had carried his ultimate burden of proving purposeful discrimination; however, she did say that the State had met its burden. It appears that the trial court may have erroneously placed the burden of proving no discriminatory intent on the State rather than placing the burden of proving purposeful discrimination on the defense.

Nevertheless, we find that the trial judge did not err in rejecting Defendant's *Batson* claims with respect to Mr. Vigne or Ms. Adams. The record reflects that the trial judge provided detailed reasons for her denials of those *Batson* challenges. Additionally, in light of *Sparks* and *Johnson*, although the trial judge did not specifically state that Defendant did not carry his burden of proving purposeful discrimination, we also find that the trial judge did not err in failing to rule expressly, when the reasons given by the State were jurisprudentially recognized, facially race neutral, and self-explanatory.

Defendant also argues that the State accepted certain jurors even though

they had family members with criminal histories yet struck Mr. Vigne and Ms. Adams for those same reasons. The State responds that while Defendant attempts to second-guess its reasons by pointing to other prospective jurors who had family members who had committed crimes, none rose to the same level as Ms. Adams, who had a nephew who killed someone and who had other nephews and a son involved in drug crimes.

The record reflects that both the State and the defense accepted Danielle Milligan and Tascha Perret as jurors. During voir dire, Ms. Milligan stated that her brother-in-law's father was murdered by his wife, who "got off" on a "technicality" and only served two years. Nevertheless, Ms. Milligan said that she could consider the evidence and be fair and impartial. Ms. Perret stated that she just found out three days earlier that her adult stepson was in jail in Texas for domestic violence. She explained that they do not speak, that it was not an issue she had to deal with, and that it would not pose a distraction for her.

If a prosecutor's proffered reason for striking a Black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step. *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005). Here, the record does not reflect the race of Ms. Milligan or Ms. Perret. Therefore, it is impossible to perform a comparative analysis between them and Mr. Vigne and Ms. Adams. Nevertheless, even if Ms. Milligan or Ms. Perret were non-black, Defendant is not entitled to relief. Even if the trial court found that Mr. Vigne's conviction was not a valid race-neutral reason for excluding him from the jury, Mr. Vigne still had problems with the reasonable doubt standard, a jurisprudentially recognized race-neutral reason. Further, the crimes described by Ms. Adams were committed by close relatives, her nephews and son, whereas the crime described by Ms. Milligan was committed by a

19-KA-363                                          95

distant relative, her brother-in-law's father's wife. Also, the domestic violence

crime referred to by Ms. Perret was committed by her adult stepson, the

incarceration for that crime had just occurred three days prior, and that crime was

not as serious as the second degree murder conviction set forth by Ms. Adams.[16]

With respect to the *Batson* challenges other than those involving Mr.

Vigne and Ms. Adams, Defendant did not make specific arguments about them.

Rather, Defendant generally argues that the trial judge erred by combining steps

two and three of the *Batson* analysis. As was stated above, in *Sparks*, the

supreme court stated that neither *Batson* nor any of its progeny had established

guidelines for a trial court performing step three of the analysis. Therefore, in

light of *Sparks* and *Johnson*, we find that the trial judge complied with the three

steps of *Batson* for all of the *Batson* challenges and found that the State's strikes

were not based on racial motivations after considering the State's offered reasons

and Defendant's arguments.  Accordingly, we find that the prosecutor's use of

peremptory strikes did not violate *Batson* and that the trial court properly

conducted the three-step analysis under *Batson*.

*ASSIGNMENT OF ERROR NUMBER FOURTEEN*

The trial court erroneously granted the State's cause challenge as to Patrick
Holland.

*DISCUSSION*

Defendant argues that the trial court abused its discretion when it granted

the State's cause challenge as to Patrick Holland.[17]   He contends that the State

---

[16] Defendant also argues that the State accepted Anthony Difulco, "whose wife's uncle lived with him and has been in and out of Angola." He states that the defense used a peremptory strike to remove Mr. Difulco. The record reflects that Mr. Difulco stated during voir dire that when he met his wife, her uncle was already in Angola. He further stated that he had only met her uncle once or twice, that her uncle came to Mr. Difulco's house for one day because he had nowhere to go, that he was not very well acquainted with her uncle, and that "once he passed him off to his mother-in-law," he never saw her uncle again. He indicated that would not affect his ability to be fair to the State and the defense. The record also reflects that defense counsel struck Mr. Difulco and that the State never said whether it accepted or rejected him.

[17] In his brief, Defendant also argues that the trial court abused its discretion by denying his challenge for cause as to Donald Allen.  Both arguments will be addressed in this assignment of error.

asked the trial court to recuse Mr. Holland for cause based on the hardship of his midterm examination and his sympathy concerning the delay in bringing Defendant to trial. Defendant asserts that Mr. Holland was rehabilitated and that his midterm could be rescheduled. He maintains that this error can only be corrected by reversing his conviction and by granting him a new trial.

The State responds that this claim is not properly before this Court because the State did not exhaust all of its peremptory challenges allowed to it by La. C.Cr.P. art. 799.[18] The State further responds that even if the trial court erred in granting its cause challenge against Mr. Holland (which it asserts that it did not), this would not entitle Defendant to relief.

Defendant also argues that prospective juror Donald Allen was unfit to serve on his jury because he could not assure the court that he would be fair and impartial. He notes that after Mr. Allen expressed that he was reluctant to look at autopsy photos, defense counsel raised a cause challenge to Mr. Allen due to his inability to look at the evidence. He further notes that the State did not join the cause challenge but instead argued that Mr. Allen was not asked directly about the photos and did not say that he would disregard other evidence and find that Defendant was guilty because he was overwhelmed by the autopsy photos. Defendant asserts that the trial court erred by denying defense counsel's cause challenge and that this error is grounds for reversal.

The State responds that this claim is not preserved for review because Defendant did not object to the denial of the cause challenge as required by La. C.Cr.P. art. 800.[19] However, the State further responds that even if this claim is

---

[18] La. C.Cr.P. art. 799 provides that "[i]n trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. In all other cases, each defendant shall have six peremptory challenges, and the state six for each defendant."

[19] La. C.Cr.P. art. 800(A) provides that "[a] defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection."

preserved for review, it is without merit. The State argues that the trial court did not err in denying this cause challenge because although he expressed reluctance to see gruesome photographs—reluctance that almost everyone would share—he indicated that he could be fair and impartial.

The record reflects that during voir dire, Mr. Holland appeared to have a problem with the delay in bringing Defendant to trial. When asked if he would be able to not consider the delay, he stated:

> Well, I mean, yeah. Like I suppose I could. But still, in the back of my mind it's still -- Like, 23 years is a long time. Like, who – Maybe this is me being too sympathetic. But, I mean, maybe the guy who killed someone in the 2nd-degree all those years ago, maybe he's not the same guy. Maybe he's been, like, humbled by this whole thing. I don't know. Maybe it's just me being sympathetic. But I just think that's a lot of time. And, you know, time can change how we -- how we see ourselves and our actions. So it's kind of hard for me to not take that into consideration.

Mr. Holland subsequently indicated that if the State proved the elements of second-degree murder, and he believed Defendant was guilty, he could return a verdict of guilty and not make that verdict based on the twenty-three-year delay. Nevertheless, Mr. Holland then indicated that he would have to be "absolutely sure." He explained that he felt "terrible" for the "convicted" with respect to the lengthy amount of time between the crime and the trial.

Mr. Holland later stated that he had midterms that week that were a priority and that they could not be rescheduled. The State subsequently challenged Mr. Holland for cause. The trial court brought him back in for further questioning. After considering Mr. Holland's concern regarding the possibility of rescheduling his midterms and his equivocation about the delay, the trial court struck Mr. Holland for cause.

The record also reflects that during voir dire, defense counsel asked the prospective jurors if they would have a problem looking at crime scene and

autopsy photographs that were "upsetting" and "disturbing." Mr. Allen responded, "Well, I'm not going to look forward to it. I don't particularly want to. But in this case if I have to, I think I'll be all right." Defense counsel asked whether that would so overwhelm him that he could not give Defendant a fair trial and treat the evidence dispassionately. Mr. Allen replied, "I hope -- I hope not. But I can't say that it's not going to overwhelm me until I see how bad it is; because I've never seen anything like that. But I don't foresee it being a problem." Defense counsel asked if there was a possibility that those images could be a problem. Mr. Allen answered, "I don't -- I mean, I don't -- I don't know. I've never seen that. I don't - - I don't particular want to see that, but I think I can handle it." After more questioning, Mr. Allen said twice, "I don't think it will be a problem." He subsequently stated, "I think I'll be still be [sic] fair and impartial."

Later on, defense counsel challenged Mr. Allen for cause, asserting that "he was very equivocal on the photos." The prosecutor disagreed, arguing that Mr. Allen had said he could handle looking at the photographs and that it would not be a problem. After hearing arguments of counsel, the trial judge denied the cause challenge, stating:

> Okay. I don't even think this is a close one. I don't think this rises to the level of cause at all. I think Mr. Thompson [SIC] was very forthcoming, saying - - And of course, he can't be a hundred percent sure that he won't have some sort of reaction. But he was very clear that he could handle it and he could put it aside. I don't think this is a cause challenge at all.

Defense counsel later used a peremptory challenge on Mr. Allen.

The Sixth Amendment to the United States Constitution guarantees the accused the right to trial by an impartial jury. *State v. Munson*, 12-327 (La. App. 5 Cir. 4/10/13); 115 So.3d 6, 12, *writ denied*, 13-1083 (La. 11/22/13); 126 So.3d 476. Further, La. Const. Art. I, § 17 guarantees the accused the right to full voir

dire examination of prospective jurors and the right to challenge those jurors peremptorily.

Jurors may be challenged for cause based on the grounds set forth in La. C.Cr.P. art. 797.[20] A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Campbell*, 06-286 (La. 5/21/08); 983 So.2d 810, 858, *cert. denied*, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008); *State v. Leger*, 05-11 (La. 7/10/06); 936 So.2d 108, 155, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).

In order to prove reversible error warranting reversal of a defendant's conviction, the defendant must show: (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges. *State v. Jones*, 03-3542 (La. 10/19/04); 884 So.2d 582, 588-89. When a defendant uses all of his peremptory challenges, a trial court's erroneous ruling on a challenge for cause which deprives him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights. In this situation, prejudice is presumed, and the conviction and sentence must be reversed. *Id.* at 588.

In the instant case, Defendant was tried and convicted for a crime necessarily punishable by imprisonment at hard labor. *See* La. R.S. 14:30.1. Under La. C.Cr.P. art. 799, both the State and the defense were entitled to twelve

---

[20] La. C.Cr.P. art. 797 provides:

The state or the defendant may challenge a juror for cause on the ground that:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

peremptory challenges each. Nevertheless, a review of the record shows that Defendant did not exhaust all of his peremptory challenges; he used only ten of them. As a result, even if the trial court erred by denying his challenge for cause as to Mr. Allen, we decline to consider this claim because he did not exhaust all of his peremptory challenges. *See State v. Koon*, 96-1208 (La. 5/20/97); 704 So.2d 756, 767, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997) (declining to consider the defendant's claim that the trial court erred in denying the defense's challenge for cause due to the defendant's failure to exhaust peremptory challenges); *State v. Milton*, 13-672 (La. App. 5 Cir. 5/14/14); 142 So.3d 157, 169 (where this Court also declined to consider the defendant's claim that the trial court erred in denying his challenges for cause as to four prospective jurors due to the defendant's failure to exhaust his peremptory challenges).

Further, the record reflects that the State used nine of its twelve peremptory challenges. As such, we find that even if the trial court erred by granting the State's challenge for cause as to Mr. Holland because the State did not exhaust all of its peremptory challenges allowed to it by La. C.Cr.P. art. 799, there is no ground for complaint. *See State v. Harris*, 18-800 (La. App. 3 Cir. 6/5/19); 274 So.3d 178, *writ denied*, 19-1107 (La. 3/9/20); 294 So.3d 486, where the third circuit found that based upon La. C.Cr.P. art. 800(B), a defendant does not have grounds to complain about the granting of the State's challenge for cause, unless the effect of the ruling is to allow the State to exercise more peremptory challenges than the law allows. The third circuit in *Harris* found that because the record showed that the State used only ten peremptory exceptions, the defendant had no ground for complaint. *See also State v. Ockman*, 16-1615 (La. App. 1 Cir. 9/15/17); 2017 WL 5643546, (unpublished opinion), *writ denied* 17-1739 (La. 5/11/18); 241 So.3d 1014, (the first circuit found that since the State only used

five of its six peremptory challenges, the dismissal of a certain prospective juror did not have the effect of giving the State more peremptory challenges than it was entitled to by law, and accordingly, the defendant had no ground for complaint.)

We therefore find that the trial court did not abuse its discretion by granting the State's challenge for cause as to Mr. Holland and by denying the defense's challenge for cause as to Mr. Allen.

*ASSIGNMENT OF ERROR NUMBER FIFTEEN*

The trial court erred in preventing the defense from mentioning Mr. Chester's prior trial.

*DISCUSSION*

Defendant argues that the trial court's prohibition against any mention of his prior trial violated his right to a fair trial. He contends that he was re-indicted for second degree murder twenty-three years following the crime and that potential jurors expressed concerns with the time delay in prosecution. Defendant further contends that the trial court had to repeatedly instruct the jury that the time delay was no fault of the defense or the State and that the jurors could not consider the time delay when deliberating his guilt. He asserts that the jury shield law makes it impossible to prove that the lack of knowledge as to why the prosecution in this trial was delayed prejudiced the jury pursuant to La. C.E. art. 606. Defendant argues that this is a structural error because an evidentiary hearing cannot be conducted on the prejudicial nature of the court's prohibition, and therefore, a new trial must be granted.

The State responds that the trial court did not improperly prohibit mention of the prior trial. It explains that prior to voir dire, the State and defense counsel discussed this issue, and defense counsel proposed a stipulation providing that there had been a prior proceeding, but the delay was not the fault of the State or Defendant. The State said that it agreed to this requested stipulation, as did the

trial court, and that the stipulation was complied with. The State argues that this claim is not preserved for review pursuant to La. C.Cr.P. art. 841(A) given that the stipulation underlying the claim was executed at Defendant's request.

The State also asserts that in his motion for new trial, Defendant argued that the trial court acquiescing to Defendant's own requested stipulation was somehow structural error. It contends that Defendant's raising of this issue in his motion for new trial does not suffice to preserve it for review. Alternatively, the State argues that should this Court find that the claim has been preserved, there is no support for the notion that this "error" could be structural. The State also points out that defense counsel was permitted to extensively voir dire on the effect that the delay in time would have on the prospective jurors' consideration of the case, leading to several challenges against prospective jurors. It maintains that informing the jury that Defendant had previously been convicted of first degree murder, sentenced to death, and been on death row until his conviction was overturned for ineffective assistance of counsel would have done nothing but prejudice him.

The record reflects that prior to voir dire, the prosecutor indicated that they needed to address what, if anything, should be said to the jury regarding the prior trial. The trial judge asked the prosecutor if he and defense counsel had discussed the matter and reached an agreement. Defense counsel stated:

> We have. We have a -- we have a proposal. We think that it's appropriate for the Court to inform the jury that there has been a prior proceeding and that the delay in getting to this point between the time of the crime and the - - this trial is no fault of the defendant, no fault of the State.
>
> I think people have a tendency to feel like - - or speculate on that - - on that time lapse and perhaps think that Teddy Chester has been on the lam all this time or something prejudicial to Mr. Chester.
>
> So we think it's appropriate to say that there has been a prior proceeding, that it is - - the delay is no fault of the

defendant or the State, that they're not to consider the delay in their - - deliberations, and that they're required to cloak Mr. Chester with the presumption of innocence.

We are - - we plan to question jurors about that as well. But we don't think that - - we think the things that are prejudicial are that a prior jury found Mr. Chester guilty. That's the statement that we are trying to avoid.

The prosecutor said he was fine with that proposal. The trial judge asked if they wanted her to tell the prospective jurors that information before voir dire or wait until the jury was impaneled. The prosecutor suggested that she should go ahead and address it from the beginning. The trial judge asked if anybody had a problem with telling them that the date of the offense was December 27, 1995. Both the prosecutor and defense counsel indicated that was not a problem.

When the first set of prospective jurors were bought into the courtroom, the trial judge stated in pertinent part:

I am sure you will notice the delay between the date of the alleged crime and today. There have been - - there has been a prior proceeding in this matter, and the delay is not the fault of the defendant or of the State. If you are selected to serve on this jury, you are not to consider the delay during your deliberations in this case.

During the questioning of the prospective jurors, defense counsel encouraged them to speculate and actually provided suggestions as to why the delay was so long between the time of the offense and the trial. Afterward, a lengthy bench conference was held to discuss the issue again. The prosecutor, defense counsel, and the trial judge discussed whether they should draft another stipulation and tell the prospective jurors the reason for the delay; however, the prosecutor objected, noting that he was not allowed to voir dire on the matter since he had adhered to the original stipulation. The trial judge agreed with the prosecutor that he would have had the right to voir dire on it too but did not due to the prior agreement. Also, the trial judge did not think it was right to have the prospective jurors speculate as to the reasons for the delay and then not give them

19-KA-363                                    104

the answer. The trial judge subsequently stated that she was going to keep the original stipulation in place. Once the prospective jurors were brought back in, the trial judge instructed them as follows:

> All right, all right. And ladies and gentlemen, there has been a delay in this case. There was a prior proceeding. Neither the State -- The delay is not the fault of the State; it is not the fault of the defendant. And it is not something that you should consider when you're considering this case. If that's something that you can't do, if you can't put that aside, the delay, if you're going to be focused on wondering why and speculating and that's going to affect you, then you need to let us know. If you can put it aside and make a decision based on the evidence presented in this court, that's something we need to know also, okay. All right.

When the second set of prospective jurors were brought into the courtroom, the trial judge gave them the original instruction regarding the delay. Following the conviction, Defendant filed a motion for new trial. In that motion, Defendant argued that the trial court's prohibition against any mention of his previous trial was structural error. At the hearing on the motion, counsel for Defendant, who was not his counsel at trial, argued that the trial court erred by prohibiting any mention of Defendant's prior conviction and procedural history. The trial judge reminded her that Defendant's trial counsel requested that the jury be so instructed. Defense counsel replied that it was still an error. The motion for new trial was later denied.

The trial court is granted broad discretion in regulating the conduct of voir dire, and its rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion. La. C.Cr.P. art. 786; *State v. Ball*, 00-2277 (La. 1/25/02); 824 So.2d 1089, 1110, *cert. denied*, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). In evaluating the fairness of the trial judge's ruling, the entire voir dire examination should be considered. *State v. Housley*, 05-502 (La. App. 5 Cir. 1/31/06); 922 So.2d 659, 662, *writ denied*, 06-1183 (La. 11/17/06); 942 So.2d 531.

Although a court has discretion to restrict voir dire, it must nevertheless afford the attorneys wide latitude in examining prospective jurors as a means of giving effect to an accused's right to a full voir dire. *State v. Harris*, 17-303 (La. App. 5 Cir. 12/20/17); 235 So.3d 1354, 1364, *writ denied*, 18-160 (La. 6/15/18); 257 So.3d 675. Thus, while a trial court has control over the scope of jury selection and may limit voir dire examination accordingly, the limitations may not be so restrictive as to deprive counsel of a reasonable opportunity to determine grounds for challenges for cause and for the intelligent exercise of peremptory challenges. *Id.*

In the instant case, we find that the trial judge did not abuse her discretion by limiting the voir dire with respect to prohibiting any mention of Defendant's previous trial. First, defense counsel asked the trial judge to advise the prospective jurors that there had been a prior proceeding and that the delay between the time of the crime and this trial was no fault of Defendant or of the State. Defense counsel never asked to rescind the stipulation. Additionally, it was defense counsel who encouraged some of the prospective jurors to speculate as to the reason for the time delay. Also, the instruction to the prospective jurors benefitted Defendant in that they never learned that Defendant was previously convicted of first degree murder and sentenced to death, which may have greatly prejudiced him. Further, even though there was a restriction on voir dire that was requested by defense counsel, defense counsel was permitted to extensively voir dire on the effect that the delay in time would have on the prospective jurors' consideration of the case.

Defendant argues that prohibiting the mention of the prior trial and conviction was structural error. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), cited by *State v. Johnson*, 94-1370 (La. 11/27/95); 664 So.2d 94, 100, the United States Supreme Court distinguished between "trial errors," which may be reviewed for harmless error and "structural

errors," which defy analysis by harmless error standards.

In *State v. Langley*, 06-1041 (La. 5/22/07); 958 So.2d 1160, 1164, *cert. denied*, 552 U.S. 1007, 128 S.Ct. 493, 169 L.Ed.2d 368 (2007), the Louisiana Supreme Court also discussed the difference between structural errors and trial errors. It stated that structural defects occur in only "a very limited class of cases," which include: (1) the total deprivation of the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); (2) a biased trial judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed.2d 749 (1927); (3) unlawful exclusion of grand jurors of defendant's race, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); (4) denial of self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); (5) denial of a public trial, *Waller v. Georgia*, *supra*; and (6) a defective reasonable doubt instruction, *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The Louisiana Supreme Court noted that other than in these six restricted classes of cases, the United States Supreme Court has failed to find structural error in the wide range of errors presented to it. *See Langley*, 958 So.2d at 1167.

The *Langley* court explained that an analysis of the "egregiousness of the conduct" or "degrees of damage" is, in reality, the type of harmless error review that a court would use to analyze a trial error. Conversely, it found that a structural error, by its very nature, impacts the entire framework of the trial from beginning to end, without reference to any other trial consideration. *Langley*, 958 So.2d at 1168.

In the instant case, the limitation placed on voir dire with respect to Defendant's prior trial and conviction at the request of defense counsel was not structural error. First, the alleged error does not fall within the restricted classes of cases mentioned above. Also, courts have used the harmless error analysis with

respect to claims regarding limiting or restricting voir dire.[21] *See State v. Allen*, 633 So.2d 325 (La. App. 1 Cir. 1993); *State v. Robinson*, 442 So.2d 827 (La. App. 4 Cir. 1983), *writ denied*, 445 So.2d 437 (La. 1984); *State v. Nicholas*, 397 So.2d 1308 (La. 1981). We conclude that trial court did not err in preventing the defense from mentioning Defendant's prior trial and any possible error was harmless considering the sufficient evidence of Defendant's guilt.

*ASSIGNMENT OF ERROR NUMBER SIXTEEN*

The trial court failed to wait the required 24-hour period before sentencing Mr. Chester after denying his motion for new trial.

*DISCUSSION*

Defendant argues that the trial court failed to wait twenty-four hours before sentencing him after denying his motion for new trial as required by La. C.Cr.P. art. 873. He further argues that he did not waive the sentencing delays. Defendant contends that the trial court's error was not harmless because he timely filed a motion to reconsider his sentence challenging his sentence under *State v. Dorthey,* 623 So.2d 1276, 1280 (La. 1993), and the Eighth Amendment. As such, Defendant argues that this Court must vacate his sentence and remand for resentencing.

The State responds that absent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of a prematurely imposed sentence is not necessary and that where a sentence is mandatory with no judicial discretion, there is no prejudice. The State further responds that Defendant is unable to show prejudice given that he received the mandatory sentence of life imprisonment without parole. With respect to Defendant's motion to reconsider

---

[21] The Louisiana Supreme Court has adopted the federal test for harmless error announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as refined by *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), which asks whether the guilty verdict rendered in this trial was surely unattributable to the error. *State v. Thompson*, 15-886 (La. 9/18/17); 233 So.3d 529, 561.

sentence, the State argues that Defendant does not show entitlement to relief under *Dorthey*. The record indicates that the trial court failed to observe the twenty-four-hour delay between denying Defendant's motion for new trial and sentencing as required by La. C.Cr.P. art. 873. There is no indication in the record that Defendant waived this delay.

When the defendant challenges the penalty imposed and the imposed sentence is not mandatory, the failure to observe the twenty-four-hour delay mandated by law cannot be considered harmless error. *State v. Bienvenu*, 14-541 (La. App. 5 Cir. 12/16/14); 167 So.3d 63, *writ denied*, 15-98 (La. 11/20/15); 180 So.3d 314. As a general rule, when a defendant challenges a non-mandatory sentence and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing. *State v. Bibbins*, 13-875 (La. App. 5 Cir. 4/9/14); 140 So.3d 153, 169, *writs denied*, 14-994 (La. 12/8/14); 153 So.3d 439 and 14-1015 (La. 12/8/14); 153 So.3d 440.

However, the failure to observe this delay is harmless when the defendant does not complain of his sentence on appeal or when the sentence imposed is mandatory. *State v. Seals*, 95-305 (La. 11/25/96); 684 So.2d 368, *cert. denied*, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); *State v. Pollard*, 14-445 (La. App. 4 Cir. 4/15/15); 165 So.3d 289, *writ denied*, 15-926 (La. 4/22/16); 191 So.3d 1044. In *Seals*, 684 So.2d at 380, the Louisiana Supreme Court found that the reversal of the sentence for failure to wait twenty-four hours between the denial of the motion for new trial and imposition of sentence was not warranted in the absence of prejudice. The defendant received a mandatory sentence of life imprisonment at hard labor pursuant to La. R.S. 14:30.1(B). The court concluded that accordingly, any error in the trial court's failure to observe the twenty-four-hour delay was harmless beyond a reasonable doubt and did not require a remand for resentencing. *Id.* at 380 ("Delay or no delay, the sentence the judge was

required to impose would have been the same. Thus, no prejudice could possibly have resulted from the failure of the court to comply with the delay."); *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09); 28 So.3d 357, 369, *writ denied*, 09-2565 (La. 5/7/10);34 So.3d 860; *State v. Petty*, 12-278 (La. App. 5 Cir. 10/30/12); 103 So.3d 616, 627; *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12); 97 So.3d 13, 41, *writ denied*, 12-993 (La. 9/21/12); 98 So.3d 332.

In the instant case, Defendant challenges his sentence, but Defendant received a mandatory life sentence for the second degree murder conviction pursuant to La. R.S. 14:30.1. Accordingly, we find that since Defendant was not prejudiced by the trial court's failure to observe the twenty-four-hour delay, this error is harmless, and no corrective action is warranted.

*ASSIGNMENT OF ERROR NUMBER SEVENTEEN*

A mandatory life without parole sentence is unconstitutional for an 18-year old convicted as a principal to second-degree murder.

*DISCUSSION*

Defendant argues that a mandatory life sentence without parole is unconstitutional for an eighteen-year-old convicted as a principal to second degree murder. He asserts that he was forty-seven days past his eighteenth birthday at the time of the offense, that he had trouble in school and never passed the ninth grade, and that he tried to sell drugs to support his girlfriend and her baby but could only manage to obtain fake drugs at the time of the crime. Defendant further asserts that while murder is a serious offense, this crime was prosecuted as a "statutorily lesser murder." He argues that he was an impressionable teenager whose immaturity and failure to appreciate risks and consequences led him to selling fake drugs and being present on Calhoun Street that night.

Defendant also argues that he is less culpable than an adult convicted of the

same crime and that at the time of the offense, he was functionally and mentally a juvenile. He claims that the Social Security Administration designated him as being intellectually disabled, and therefore, he was qualified for social security disability benefits. Defendant notes that he had no control over the environment that he was raised in, i.e., a high drug-trafficking neighborhood where many of the community members were drug dealers or drug users. He states that he was unable to extricate himself from "crime-producing settings" and that he imitated what he saw many others his age and older doing.

Defendant explains that scientific studies of adolescent brain structure and functioning show that teenagers have underdeveloped personalities and are labile, situation-dependent, impulse driven, peer-sensitive, and largely lacking in the mechanisms of self-control, which almost all will gain later in life. He further explains that it was these common features of youth that led the United States Supreme Court to conclude that juveniles under eighteen possess an inherently "lessened culpability," citing *Graham v. Florida*, 560 U.S. 48, 50, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

The State responds that Defendant's mandatory sentence of life imprisonment without parole is not excessive and that La. R.S. 14:30.1 provides for a mandatory sentence of life imprisonment without parole for second degree murder. The State explained that while recent United States Supreme Court jurisprudence holds mandatory life imprisonment without parole sentences for juvenile murderers unconstitutional, Defendant was eighteen at the time of his crime and was not a "juvenile" under controlling jurisprudence. It asserted that while Defendant claims that he is intellectually disabled, the trial court, after an extensive *Atkins* hearing, found that he is not intellectually disabled. The State contends that although Defendant presents argument relative to his supposedly difficult life, none of this approaches rising to the level required by *Dorthey* and

19-KA-363                                                111

its progeny to deviate below a mandatory minimum sentence. It further contends that while Defendant essentially seeks to expand *Miller*[22] and *Montgomery*[23] (and its forerunners) to eighteen-year-olds and beyond, the United States Supreme Court put the line at age eighteen, and Louisiana jurisprudence has declined to move the line further up.

Defendant was convicted of second degree murder in violation of La. R.S. 14:30.1. On December 12, 2018, Defendant filed a Motion to Bar a Life Without Parole Sentence for Adolescents as Unconstitutional. In his motion and at the hearing, Defendant made the same arguments that he has made on appeal. During Defendant's argument, the trial court indicated that Defendant was eighteen years old at the time of the offense, and therefore, *Miller* was inapplicable. The trial court also noted that it had previously found in an *Atkins* hearing that Defendant was not intellectually disabled. The trial court subsequently denied that motion.

Following the victim impact statement, Defendant received a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On January 11, 2019, Defendant filed a Motion to Reconsider Sentence. In that motion, Defendant argued that based on his age, life circumstances, intellectual disability, and version of events regarding the instant offense, a life sentence without parole was excessive and unconstitutional. On February 8, 2019, the trial court denied the motion in writing, noting that Defendant was sentenced in accordance with statutory provisions and that he was not entitled to any reconsideration or reduction in sentence.

This Court has held that the failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. *State v. Hunter*,

---

[22] *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).
[23] *Montgomery v. Louisiana*, - - U.S. - - , 136 S.Ct. 718, 193 L.Ed.2d 599 (2016).

10- 552 (La. App. 5 Cir. 1/11/11); 59 So.3d 1270, 1272. *See also* La. C.Cr.P. art. 881.1(E). Because Defendant filed a Motion to Reconsider Sentence stating the specific grounds upon which the motion was based, and because he raises these same grounds on appeal, we find that Defendant's arguments on appeal were properly preserved for review.

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *State v. Wilmot*, 13-994 (La. App. 5 Cir. 5/14/14); 142 So.3d 141, 148; *State v. Horne*, 11-204 (La. App. 5 Cir. 2/14/12); 88 So.3d 562, 569, *writ denied*, 12-556 (La. 6/1/12); 90 So.3d 437.

A trial court is given wide discretion in determining a sentence, and an appellate court will not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); *State v. Pearson*, 07-332 (La. App. 5 Cir. 12/27/07); 975 So.2d 646, 656. An appellate court cannot set aside a sentence as excessive absent a manifest abuse of discretion. *State v. Williams*, 03- 3514 (La. 12/13/04); 893 So.2d 7, 16-17. On review, an appellate court does not determine whether another sentence may have been more appropriate but whether the trial court abused its discretion. *Id*. at 17.

In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing the sentence. *State v. Lobato*, 603 So.2d 739, 751 (La. 1992); *State v. Howard*, 18-159 (La. App. 5 Cir. 11/7/18); 259 So.3d 583, 590,

*writ denied*, 18-2034 (La. 4/29/19); 268 So.3d 1031; *State v. Allen*, 03-1205 (La. App. 5 Cir. 2/23/04); 868 So.2d 877, 879.

For those offenders convicted of second degree murder in Louisiana, La. R.S. 14:30.1 mandates a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. *State v. Garrison*, 19-62 (La. App. 5 Cir. 4/23/20); 297 So.3d 190, *writ denied*, 20-547 (La. 9/23/20); 301 So.3d 1190. However, the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), held that a State's sentencing scheme that mandates life imprisonment without parole for those offenders under the age of eighteen at the time they committed a homicide offense, violates the Eighth Amendment prohibition against cruel and unusual punishment.[24] *State v. Stewart*, 13-639 (La. App. 5 Cir. 01/31/14); 134 So.3d 636, 639, *writ denied*, 14-420 (La. 9/26/14); 149 So.3d 260. The *Miller* Court did not establish a categorical prohibition against life imprisonment without parole for juveniles but rather required that a sentencing court consider an offender's youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for juveniles who have committed a homicide offense. *State v. Williams*, 12-1766 (La. 3/8/13); 108 So.3d 1169 (per curiam).

In the instant case, Defendant was eighteen years old at the time of the offense. In *State v. Hogan*, 47,993 (La. App. 2 Cir. 4/10/13); 113 So.3d 1195, 1202, *writ denied*, 13-977 (La. 11/8/13); 125 So.3d 445, the second circuit recognized that the decision in *Miller v. Alabama*, *supra*, is only applicable to juvenile offenders. The appellate court found that for purposes of the Eighth Amendment, a "juvenile offender" is a person under the age of

---

[24] In *Montgomery v. Louisiana*, - - U.S. - - , 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), the United States Supreme Court held that *Miller* was retroactive.

eighteen years at the time of the offense. *Hogan*, *supra*; *See also State v. Hadnot*, 15-36 (La. App. 3 Cir. 6/3/15); 2015 WL 3548396 (unpublished opinion).

The penalty for second degree murder is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14.30.1. A mandatory minimum sentence is presumed constitutional. *State v. Royal*, 03-439 (La. App. 5 Cir. 9/30/03); 857 So.2d 1167, 1174, *writ denied*, 03-3172 (La. 3/19/04); 869 So.2d 849. Further, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. *See State v. Landry*, 388 So.2d 699 (La. 1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); *State v. Lovick*, 00-1833 (La. App. 5 Cir. 5/16/01); 788 So.2d 565, 573, *writ denied*, 01-1836 (La. 5/10/02); 815 So.2d 833; *Hill*, 742 So.2d at 690; *State v. Pendelton*, 96-367 (La. App. 5 Cir. 5/28/97); 696 So.2d 144, *writ denied*, 97-1714 (La. 12/19/97); 706 So.2d 450.

In *State v. Dorthey*, 623 So.2d 1276 (La. 1993), the Louisiana Supreme Court recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness. In *State v. Johnson*, 97-1906, (La. 3/4/98); 709 So.2d 672, 676, the Louisiana Supreme Court reexamined *Dorthey* and outlined the criteria a defendant must meet in order to show that a mandatory minimum sentence under the Habitual Offender Law is constitutionally excessive. Although *Dorthey* involved a mandatory enhanced sentence, this Court has applied the principles set out in *Dorthey* to the review of mandatory life sentences other than those imposed under the Habitual Offender Law. *See State v. Temple*, 01-655 (La. App. 5 Cir. 12/12/01); 806 So.2d 697, 707, *writ denied*, 02-234 (La. 1/31/03); 836 So.2d 58; *State v. Fobbs*, 99-1024 (La. 9/24/99); 744 So.2d 1274, 1275.

In order to rebut the presumption that a mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is "exceptional, which ... means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case." *Johnson*, *supra*. A sentencing court should exercise its authority to declare excessive a mandatory minimum sentence only under rare circumstances. *State v. Lindsey*, 99-3302 (La. 10/17/00); 770 So.2d 339, 345, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).

Here, Defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. (*See State v. Harris*, 02-873 (La. App. 5 Cir. 1/28/03); 839 So.2d 291, 295, *writ denied*, 03-846 (La. 10/31/03); 857 So.2d 474, where the defendant made no argument and presented no evidence regarding a downward departure from the mandatory life sentence. As such, this Court held that the defendant failed to carry his burden under *Johnson*, *supra* and concluded that the defendant's life sentence was not excessive; *see also Francois*, 242 So.3d at 820, where this Court held the defendant failed to show by clear and convincing evidence that his particular circumstances were an exception to the constitutional application of the mandatory sentence of life imprisonment at hard labor).

As was discussed previously, the evidence was sufficient for the jury to find that Defendant was either the shooter or at least a principal to the shooting. The record reflects that Defendant admitted that he was in the cab. However, even if he was not the shooter, he fled the scene after the shooting, did not get help or report the shooting, and later told his girlfriend that he was going to California.

Considering the totality of the facts and circumstances of this case and the jurisprudence, we find that trial court did not abuse its discretion in sentencing Defendant to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for his conviction of second degree murder.

*ASSIGNMENT OF ERROR NUMBER 19*[25]

The cumulative errors in this case require reversal.

*DISCUSSION*

Defendant argues that the errors in this case, both individually and cumulatively, violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Louisiana Constitution. Therefore, Defendant contends that even if this Court inexplicably finds that no single error in this case, standing alone, calls for reversal of the conviction and/or sentence, it should grant a new trial based on the numerous errors that prevented him from obtaining a fair trial.

The State responds that Defendant does not show any errors, let alone cumulative error. It further responds that the Louisiana Supreme Court has never endorsed cumulative error arguments.

The Louisiana Supreme Court considered a similar cumulative error argument in *State v. Holliday*, 17-1921 (La. 1/29/20); 2020 WL 500475, finding no reversible error "[d]espite fastidious examination of the record and all of defendant's assignments of error[.]" The supreme court has noted that "the combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial."

---

[25] This assignment of error was unspecified in Appellant's brief.

(quotations omitted). The supreme court recognized that although it has often reviewed cumulative error arguments, it has continually rejected them and instead has consistently found that harmless errors, however numerous, do not aggregate to reach the level of reversible error. The supreme court further noted that other courts have reached the same conclusion in addressing this issue. The court concluded that it did not find any substantive error in the lower court proceedings, and therefore, no cumulative error warranting reversal existed.

In *State v. Turner*, 16-1841 (La. 12/5/18); 263 So.3d 337, 407, *cert. denied*, - - U.S. - - , 140 S.Ct. 555, 205 L.Ed.2d 355 (2019), the Louisiana Supreme Court stated:

> This Court has held: "[T]he combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial." Although the Court has often reviewed cumulative error arguments, it has never endorsed them. Instead, the Court has consistently found that harmless errors, however numerous, do not aggregate to reach the level of reversible error.

(Citations omitted). *See also State v. Campbell*, 16-341 (La. App. 5 Cir. 12/28/16); 210 So.3d 508, 514 n.12 ("The Supreme Court has noted that the 'cumulative error' doctrine has lost favor in the Louisiana courts." Significantly, the Louisiana Supreme Court in *Manning*, *supra* rejected the cumulative error doctrine by noting that "twenty times zero equals zero.").

In the instant case, upon reviewing Defendant's arguments on appeal, we find that Defendant is not entitled to reversal on any of the grounds as presented in his assignments of error. Thus, based on the foregoing jurisprudence, the cumulative effect of these claims does not entitle Defendant to relief.

*UNSPECIFIED ASSIGNMENT OF ERROR*

Defendant's due process rights were violated by diametrically opposed prosecutions and perjured testimony

*DISCUSSION*

Defendant argues that he is entitled to a new trial because the State presented inconsistent theories at his two trials and the trial of his co-defendant. In his first trial, the State's theory was that Defendant was the shooter, but in the second trial, the State provided evidence that he was either the shooter or a participant in an armed robbery that turned deadly. Defendant further argues that the State's inconsistent theories made it possible to convict two defendants as a principal to one crime. He contends that because a citizen's liberty is at stake, it is a violation of due process for the State to present multiple theories in hope that the jury finds the accused guilty of one. Defendant relies on Justice Stevens' dissent in *Jacobs v. Scott*, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995).

Defendant also contends that Quinice Pollard's testimony differed from the first trial to the second trial in several ways, including the time and location of Defendant's confession to her. He also alleges that Ms. Pollard committed perjury in the second trial and that his conviction was obtained in large part on her perjured testimony.

The State responds that it did not use "diametrically opposed prosecutions" or "perjured testimony." It maintains that it did not take inconsistent and irreconcilable positions in the two trials of Defendant and his co-defendant, Mr. Ratcliff. The State explains that in Defendant's first trial, it charged Defendant with, and convicted him of, first degree murder based on his specific intent to kill or to inflict great bodily harm while committing, or attempting to commit, an armed robbery. Mr. Ratcliff was convicted of second degree murder in his separate trial.

The State asserts that in Defendant's second trial, it proceeded with a charge of second degree murder based on alternative theories of: (1) specific

intent to kill or to inflict great bodily harm or (2) that the killing occurred during the perpetration or attempted perpetration of an armed robbery even if Defendant had no intent to kill or to inflict great bodily harm. The State argues that it did not allege something to be true in Defendant's trials and then alternatively allege something completely inconsistent and irreconcilable to be true in Mr. Ratcliff's trial. It maintains that it is alleging that both are guilty of second degree murder under a specific intent theory or under a "felony murder" theory.

The State contends that, pursuant to La. R.S. 14:24[26], there is no prohibition on convicting two defendants as a principal to one crime. It further contends that a jury is not constitutionally required to agree on a single theory to convict a defendant when it is given instructions regarding alternative theories. The State submits that there is no prohibition against the prosecution presenting different evidence or presenting the evidence in a different way at a defendant's subsequent new trial.

With respect to Ms. Pollard, the State points out that the jurisprudence prohibits it from deliberately relying upon perjured testimony. The State counters that although Defendant argues that Ms. Pollard's instant trial testimony was in some ways inconsistent with her prior testimony, he makes no showing that her instant trial testimony was perjured or that the State knew of such supposed perjury. It notes that Defendant extensively cross-examined Ms. Pollard and put these inconsistencies and other issues before the jury but the jury chose to believe Ms. Pollard.

At Defendant's first trial, he was indicted and convicted of first degree murder. The jury was instructed that in order to convict Defendant of first degree murder, it must find that Defendant killed the victim or was a principal to

---

[26] La. R.S. 14:24:  All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

the killing of the victim, that Defendant acted with the specific intent to kill or to inflict great bodily harm, and that Defendant was engaged in the perpetration or attempted perpetration of armed robbery. The jury was instructed that it could also convict Defendant of first degree murder if it found that Defendant killed or was the principal to the killing of a human being, that he acted with the specific intent to kill or to inflict great bodily harm, and that he was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance listed in Schedules I, II, III, IV or V of the Uniform Controlled Dangerous Substances Law.

At Defendant's first trial, a witness for the State testified that when a victim is shot in the back of the head from behind, the blood spatter blows back in the direction from which the shot was fired.[27] *See State v. Chester*, 97-2790 (La. 12/1/98); 724 So.2d 1276, 1281, *cert. denied*, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999). The State contended that Defendant pulled the trigger from the driver's side of the back seat because no blood was found on the back passenger side and Defendant's clothes and cap revealed evidence of blood. *Id.*

Mr. Ratcliff, the co-defendant, was subsequently convicted of second degree murder. See *State v. Ratcliff*, 98-101 (La. App. 5 Cir. 2/23/99); 731 So.2d 356, *writ denied*, 99-1112 (La. 9/3/99); 747 So.2d 541. In that case, this Court found, "[b]ased on the entirety of the testimony and the evidence presented by the state, a rational trier of fact could have found that defendant was an active participant to an attempted perpetration of an armed robbery at the time the victim was killed." *Id.* at 363.

In the instant case, Defendant was indicted and convicted of second degree murder. The jury was instructed that in order to convict Defendant, it must find

---

[27] From the record it appears that this witness was Sergeant Thornton.

that Defendant killed the victim and acted with the specific intent to kill or to inflict great bodily harm. The jury was instructed that it could also convict Defendant of second degree murder if it found that Defendant killed the victim, whether or not he had an intent to kill or inflict great bodily harm, while Defendant was engaged in the commission or attempted commission of armed robbery. At the second trial, Chief Deputy Scanlan testified that the victim's injury was consistent with the shooter being in the rear seat; however, he could not tell whether the shooter was in the driver-side or passenger-side rear seat. He asserted that a subtle change of the position the victim's head would have changed the angle fairly significantly and that he could not tell whether the victim moved immediately before he was shot.

In *Jacobs v. Scott*, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995), the United States Supreme Court denied the application for stay of execution of sentence of death and the petition for writ of certiorari. In a dissent, Justice Stevens stated, "Moreover, for a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases-and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence-surely raises a serious question of prosecutorial misconduct," and "I have long believed that serious questions are raised 'when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.'"

In *State v. Holmes*, 06-2988 (La. 12/2/08); 5 So.3d 42, 62, *cert. denied*, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009), the Louisiana Supreme Court stated that "[d]ue process forbids a state from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event." In *Holmes*, the defendant contended that the State violated her due process rights when it offered an alternate theory of the

crime at the trial of her co-defendant, Robert Coleman, and argued a different theory of the crime to the jury in her trial. The Louisiana Supreme Court found that the State neither set forth inconsistent nor mutually exclusive theories of the crime at the defendant and Coleman's trials. To the contrary, the supreme court found that it was clear that the State merely emphasized each offender's culpability at their respective trials. *See also State v. Adams*, 04-77 (La. App. 3 Cir. 9/29/04); 884 So.2d 694, 704-05, *writs denied*, 04-2709 (La. 2/25/05); 894 So.2d 1131 and 04-2880 (La. 2/25/05); 894 So.2d 1132. (The prosecution presented the same evidence by the same witnesses but emphasized the culpability of different defendants at two trials. The court found that the two different theories advanced by the State were not inconsistent or irreconcilable.)

In the instant case, the State presented evidence and argued in Defendant's first trial that Defendant was the shooter; the trial court nevertheless instructed the jury that it could convict Defendant as a principal to first degree murder. At Defendant's second trial, the State argued that Defendant may have been the shooter, and the trial court instructed the jury that it could convict Defendant as a principal to second degree murder. Also, as was stated previously, this Court found in Mr. Ratcliff's case that a rational trier of fact could have found that he was an active participant in an attempted armed robbery at the time the victim was killed.

In light of the foregoing, we find that the State did not take inconsistent and irreconcilable positions in Defendant's two trials and in Mr. Ratcliff's trial. In Defendant's second trial and in Mr. Ratcliff's trial, the State alleged that both Defendant and Mr. Ratcliff were guilty of second degree murder under the specific intent theory or the felony murder theory. Defendant argues that it is a violation of due process for the State to present multiple theories in the hope that the jury finds him guilty of one. However, a jury is not constitutionally required

to agree on a single theory to convict a defendant where it is instructed as to alternative theories. *See State v. Seals*, 09-1089 (La. App. 5 Cir. 12/29/11); 83 So.3d 285, 346, *writ denied*, 12-293 (La. 10/26/12); 99 So.3d 53, *cert. denied*, 569 U.S. 1031, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013).

Defendant also contends that Ms. Pollard's testimony differed from the first trial to the second trial in several ways, including the time and location of Defendant's confession to her. He further contends that Ms. Pollard committed perjury in the second trial and that his conviction was obtained in large part on her perjured testimony.

In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the United States Supreme Court held that where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness. *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177. To prove a *Napue* claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. *State v. Broadway*, 96-2659 (La. 10/19/99); 753 So.2d 801, 814, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000). Furthermore, fundamental fairness, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, *supra*.

When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States*, *supra*. However, the grant of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually

false; (2) the prosecution knew they were false; and (3) the statements were material. *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997), *cert. denied*, 523 U.S. 1078, 118 S.Ct. 1525, 140 L.Ed.2d 676 (1998). *See also Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002), *cert. denied*, *stay denied*, 536 U.S. 978, 123 S.Ct. 14, 153 L.Ed.2d 877 (2002) ("Importantly, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.")

In the instant case, although Ms. Pollard's testimony at the second trial was not identical to her testimony at the first trial, Defendant did not prove that her testimony at the second trial was perjured or that the State knew of such supposed perjury. Also, Defendant thoroughly cross-examined Ms. Pollard regarding the alleged inconsistencies at the second trial and the alleged inconsistencies between 1997 and the second trial, but the jury chose to credit her testimony.

In sum, we find no merit to the argument that the State did not take inconsistent positions in Defendant's two trials and in Ratcliff's trial. Further, we find that Defendant has failed to show that Ms. Pollard's testimony was perjured or that the State knew of any alleged perjury.

*ERRORS PATENT REVIEW*

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990) and one error was found, which we discuss under Assignment of Error Number Sixteen. Our review reveals no errors that require corrective action.

*DECREE*

For the foregoing reasons, Defendant's conviction of second degree murder and life sentence without benefits are affirmed.

19-KA-363 **<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **FEBRUARY 3, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 19-KA-363

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE ELLEN SHIRER KOVACH (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)       THOMAS J. BUTLER (APPELLEE)       CECELIA T. KAPPEL (APPELLANT)
RACHEL I. CONNER (APPELLANT)        SHANITA FARRIS (APPELLANT)        BIDISH J. SARMA (AMICUS)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053